[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 02-14131
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 21, 2004
THOMAS  K. KAHN
CLERK

D.C. Docket No. 95-00649-CV-WBH-1

TELECOM TECHNICAL SERVICES INC., a Texas
Corporation,

Plaintiff-Counter
Defendant,

REALCOMM OFFICE COMMUNICATION, INC., a
Georgia Corporation,
NOVA USA TELECOMMUNICATIONS CO., a
Virginia Corporation,
AMERICAN TELECOM CORP.,
DD HAWKINS COMMUNICATIONS, INC.,
a Texas Corporation Headquartered in
Denison, Texas,
SHARECOM DIVISION OF START TECHNOLOGIES
CORPORATION, a Division of the Delaware
Corporation,
CMS COMMUNICATIONS, INC.,
a Missouri Corporation Headquartered in St.
Louis, Missouri with Offices in Houston
and Dallas, Texas,
OLDE YORK VALLEY INN,
a Pennsylvania Proprietorship Headquartered
in York, Pennsylvania,

Plaintiffs-Counter
Defendants-Appellants,

versus

ROLM COMPANY,

Defendant-Counter
Claimant,

SIEMENS ROLM COMMUNICATIONS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(October 21, 2004)**

Before BLACK and KRAVITCH, Circuit Judges, and STROM[*], District Judge.

KRAVITCH, Circuit Judge:

The appellants, a group of independent telephone service companies and telephone system customers, appeal the dismissal on summary judgment of their antitrust claim against Siemens Rolm Communications ("Siemens"). The issue is whether Siemens's refusal to sell or license patented or copyrighted goods to the appellants is an illegal use of monopoly power in a secondary market. The appellants also appeal the jury verdicts on Siemens's cross-claims against them stemming from

---

[*]Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

copyright and patent infringement.

I. Facts

Siemens produces private branch exchanges ("PBXs"), also referred to as "switches," which are computers that direct telephone calls and data transmissions through a network of private extensions. Businesses that have multiple telephone lines use PBXs to send and receive calls. The PBXs include hardware (the physical parts making up the switch) and software components (the telephone system program). Siemens possesses intellectual property rights over some of the hardware and all of the software used in its PBXs. Siemens does not sell the software, but sells licenses to use the system. Depending on the what type of system the customers want and the price they wish to pay, the software can be activated to provide more or fewer features.

In addition to selling licenses to use its PBXs, Siemens also sells PBX servicing for its products. Siemens has a patent on many of its parts and does not sell parts to third parties for resale. A customer can service its PBX in one of three ways. First, it can hire Siemens to service the PBX. Second, it can order the parts directly from Siemens (or an authorized distributor) and make arrangements to service the machine themselves. Third, it can hire an independent service organization ("ISO") to service the machine, although Siemens requires that the customer furnish the ISO

3

with a letter of agency authorizing it to order the part on the customer's behalf before Siemens sells the part.

The appellants, primarily a group of ISOs that specialize in servicing PBX systems, allege that Siemens has created a monopoly in the market for servicing Siemens's PBXs.[1] They claim that Siemens's refusal to sell parts to third parties is designed to prevent competition in the service market. The district court initially denied Siemens's motion for summary judgment on the antitrust claim, but later reversed that ruling based on the Court of Appeals for the Federal Circuit's holding that an antitrust claim could not be brought based on a refusal to sell patented parts or license copyrighted software.[2] See In re Indep. Servs. Org. Antitrust Litig., 203 F.3d 1322 (Fed. Cir. 2000) ("In re ISO"). The ISOs now appeal.

Siemens filed counterclaims against certain individual appellants stemming from their alleged infringement on Siemens's patents and copyrights. Siemens claimed that all of the ISOs had infringed on its copyrights and patents by copying and distributing software covered by Siemens's intellectual property rights. Siemens

---

[1] None of the appellants allege that Siemens has a monopoly over the market for PBX sales. Companies other than Siemens, including Lucent Technologies and Nortel, also compete with Siemens for PBX customers. Telecomm Tech. Serv., Inc. v. Siemens Rolm Comm., Inc., 66 F. Supp. 2d 1306, 1310 (N.D. Ga. 1998).

[2] The district court believed that this case would be appealed to the Court of Appeals for the Federal Circuit. That court, however, determined that it did not have jurisdiction over this case because the patent claims were only raised as counterclaims. The case was then transferred back to this court.

further claimed that by distributing protected software, the ISOs tortiously interfered with Siemens's contractual relations with its customers.  Finally, Siemens claimed that three ISOs (ATC, TTSI, and RealCom) misappropriated trade secrets by stealing passwords that allowed the ISOs to activate features that customers had not licensed from Siemens.

The district court, before dismissing the antitrust claim altogether, bifurcated the antitrust claim and the counterclaims into separate trials.  A trial was held on the counterclaims and the jury returned a verdict for Siemens on all claims.  The district court, however, limited the damage award because awards for the different claims were duplicative.  The court upheld only the damage award for copyright infringement within the three-year statute of limitations period because all of the other claims were derivative of the copyright infringement.  The ISOs appeal the jury verdict on a number of grounds.  Siemens does not appeal the reduction in damages.

II.  The Antitrust Claim

The issue here is whether Siemens's refusal to sell parts for its PBX systems, some of which are protected by patent or copyright, is a use of monopoly power *in the service market* in violation of antitrust laws.

1.  Procedural Background

The district court, relying on the Supreme Court's decision in <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 457 (1992) ("<u>Kodak I</u>"), initially determined that the plaintiffs presented sufficient evidence to withstand a motion for summary judgment on their antitrust claim. In <u>Kodak I</u>, as in this case, ISOs brought suit against Kodak for failure to sell parts required to service Kodak machines. Kodak had a policy of refusing to sell parts to any ISO and would only ship parts to customers who planned to service the machines themselves. The ISOs argued, and the Supreme Court agreed, that they should be able to proceed to trial on two antitrust claims. The ISOs' first claim was that Kodak "tied" the parts and service markets in violation of § 1 of the Sherman Act. In short, the plaintiffs claimed that Kodak was using its market power in the *parts market* to require that customers also buy from Kodak in the *service market*. By making access to Kodak parts contingent on buying Kodak service, Kodak was illegally using its market power in one market (parts) to limit competition in another market (service).

The ISOs's second claim was that Kodak was attempting to maintain a monopoly in violation of § 2 of the Sherman Act. To demonstrate a violation of § 2, the plaintiffs must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

6

acumen, or historical accident." Id. at 480. The Supreme Court held that the ISOs presented sufficient evidence to withstand summary judgment for both elements by demonstrating that Kodak controlled 100% of the parts market and used this power to dominate 80% to 95% of the service market.

Here, the district court considered whether Siemens used illegal means to dominate the service market.[3] The ISOs alleged that Siemens violated § 2 of the Sherman Act by using its control of the *parts* market to establish and maintain a monopoly in the *service* market.[4] Siemens responded with two arguments. First, Siemens disputed whether the purchase of the PBX system and the servicing of the system were two separate markets. Siemens maintained that the existence of a competitive market for the purchase of PBX systems prevented the company from undertaking anti-competitive action in the service market.[5] If only one market

---

[3] The appeal here, unlike Kodak, does not involve a § 1 tying claim.

[4] To demonstrate that Siemens was illegally using monopoly power in the service market, the ISOs presented evidence that Siemens's prices for servicing were 30% to 60% higher than comparable ISO prices.

[5] Siemens's argument is based on a "life-cycle" theory of consumer buying where the consumers include present and future costs (such as servicing) when deciding which telecommunications system to purchase. In short, Siemens argued that customers considered the costs of service when making initial purchasing decisions and that this prevented Siemens from later charging super-competitive prices to service the PBX system. The Supreme Court rejected a similar life-cycle argument in Kodak I, but stated that a court needed to look at the facts of each case in evaluating whether consumers would realistically use life-cycle pricing when making purchasing decisions. 504 U.S. at 472-77. Here, the ISOs argue that the life-cycle theory is unrealistic, as it was in Kodak, because there are high initial costs to leasing a PBX system and customers are then "locked-in" to the system even if Siemens charges super-competitive prices for service.

7

existed, then Siemens could not illegally tie or leverage its dominance in one market into another market. Second, Siemens argued that its intellectual property rights in its PBX parts and software granted it the right to refuse to sell to competitors and, thereby, insulated it from antitrust liability under § 2 of the Sherman Act. The district court initially rejected both of these arguments. The court found that there was sufficient evidence for a jury to determine whether two markets existed and held that Siemens's intellectual property rights in the parts market did not immunize it from antitrust liability in the service market.

The district court reversed its original summary judgment ruling, however, after the Court of Appeals for the Federal Circuit issued its decision in In re ISO. 203 F.3d at 1322. There, a group of ISOs, relying on Kodak, argued that Xerox was establishing a monopoly in the servicing of its machines by refusing to sell parts to independent service companies. In re ISO, 203 F.3d at 1326-27. The Court of Appeals for the Federal Circuit rejected that argument, finding that Xerox could refuse to sell *patented* parts and not run afoul of antitrust law. Id. If Xerox's policy with regards to its patented products happened to create a monopoly in the service market, this was simply an outgrowth of Xerox's statutory patent rights in the parts market and not an antitrust violation. Id. at 1328-30.

The district court applied Federal Circuit law because it believed (correctly at

the time) that the patent issues involved placed an appeal in this case under the Federal Circuit's jurisdiction. The court, therefore, altered its earlier ruling to be consistent with the In re ISO decision. The district court determined that Siemens's failure to sell *patented parts or copyrighted software* was not an antitrust violation, but that Siemens's refusal to sell parts or license software not protected by intellectual property law could be a violation of § 2 of the Sherman Act. Nonetheless, the district court granted summary judgment for Siemens because the ISOs failed to separate the effects of Siemens's lawful conduct (refusing to sell patented parts) and alleged unlawful conduct (refusing to sell unpatented parts) in the service market. As a result, the plaintiffs failed to establish a sufficient causal relationship between the alleged unlawful activity and their injury. In addition, the district court credited the ISOs' claim that they could not perform timely and efficient service if denied access to *any* important part and, thus, the district court determined that the ISOs would be unable to compete in the service market by Siemens's legal activity alone.

In the time between the district court's order and this appeal, however, the Supreme Court determined that the Federal Circuit does not have jurisdiction over appeals unless a patent issue is on the face of the initial complaint. See Holmes Group, Inc. v. Vornado Air Circulation Sys., 535 U.S. 826 (2002). Because the face of the complaint, here, addresses antitrust issues and patent infringement issues are

9

only raised as counterclaims, the Federal Circuit determined that it did not have jurisdiction over the present case and transferred it to this court. Consequently, the Federal Circuit opinion in In re ISO now only has persuasive authority.

2. Antitrust Issue

Several circuits have directly confronted the question of how to weigh the significance of a firm's assertion of intellectual property rights as a justification for its refusal to deal in the context of a § 2 Sherman Act action. See In re ISO, 203 F.3d at 1327-28; Image Tech. Servs v. Eastman Kodak Co., 125 F.3d 1195 (9th Cir. 1997) ("Kodak II"); Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147 (1st Cir. 1994). We recognize that this question lies at the intersection of intellectual property law and antitrust law and presents a difficult and increasingly important issue. In this case, however, we do not need to reach to this question, because we can resolve the antitrust issue on other grounds alone.[6]

As an introductory note, we observe the importance of carefully distinguishing between the various intellectual property regimes—patent, copyright, and trademark. Each of these regimes confers somewhat different property rights and provides a different type of protection.

---

[6] We review de novo the district court's grant of summary judgment. Williams v. Bellsouth Telcomms, Inc., 373 F.3d 1132 (2004).

(a) PBX Repair Parts

Siemens asserts that its right to refuse to sell PBX repair parts derives from the patent protection it enjoys for many of those parts. The Patent Act provides the patent owner with what amounts to a permissible monopoly over the patented work. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135 (1969). Patent laws "are in pari materia with the antitrust laws and modify them pro tanto (as far as the patent laws go)." Simpson v. Union Oil Co., 377 U.S. 13, 14 (1964). As a number of recent cases have observed, there is a tension between the protections offered by patent and antitrust laws. See In re ISO, 203 F.3d at 1325-26; Kodak II, 125 F.3d at 1215; Data General, 36 F.3d at 1187.[7]

As noted above, however, we need not address what impact Siemens's patent

_____

[7] Each of these decisions adopted a different approach to dealing with the issue. In In re ISO, the Federal Circuit held that patent holders who unilaterally refuse to license their products are exempt from the antitrust laws unless one of three conditions exist: (1) the patent was obtained by fraud on the Patent Office, (2) the patent holder tied the sale of the patent to other goods or services, or (3) the patent holder brought sham enforcement proceedings to interfere with a competitor's business. In re ISO, 203 F.3d at 1326-28. In Data General, the court adopted a rebuttable presumption standard in a copyright case, drawing an analogy between copyright and patent law. Data General, 36 F.3d at 1188-89. Finally, in Kodak II, the court purported to apply the Data General presumption in a patent case, but held that it is possible to rebut this presumption is through evidence of pretext. Kodak II, 125 F.3d at 1219. Commentators have criticized all of these approaches. In particular, the approaches of the Ninth Circuit and Federal Circuit have received extensive commentary. See 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 709b (2d ed. 2002) (criticizing Ninth Circuit approach); Jonathan I. Gleklen, *Per Se Legality for Unilateral Refusals to License IP is Correct as a Matter of Law and Policy*, The Antitrust Source (July 2002), *at* http://www.antitrustsource.com (same); Robert Pitofsky, *Challenges of the New Economy: Issues at the Intersection of Antitrust and Intellectual Property*, 68 Antitrust L.J. 913 (2001) (criticizing Federal Circuit approach); Jeffrey K. MacKie-Mason, *Antitrust Immunity for Refusals to Deal in (Intellectual) Property is a Slippery Slope*, The Antitrust Source (July 2002), *at* http://www.antitrustsource.com (same).

11

rights may have on its refusal to sell its parts. Under Data General, Siemens's behavior does not constitute exclusionary conduct in violation of § 2 of the Sherman Act because there is no evidence of any harm to equipment owners, completely independent of any patents Siemens may have on these parts.

In Data General, the defendant Data General designed, manufactured, and serviced mini-computers. 36 F.3d at 1152-54. Grumman also serviced computers made by Data General. Data General adopted a policy of only selling its repair parts to owners of its equipment. Thus, a third party such as Grumman had no way to obtain the parts from Data General. An equipment owner could, however, order the repair parts and then use a third party to perform the servicing. The parts were not patented. Nonetheless, the First Circuit held that

> [w]e cannot presume that elimination of an intermediate seller of such items harms consumers; indeed, consumers are likely to benefit by not having to accept [third-parties'] mark-up of [the defendant's] prices. Further, a direct sales policy does not act as a significant barrier to market entry by competitors offering lower prices for higher quality support services. [Third-party] technicians may...install spare parts the customer has ordered from [the defendant.]
> Id. at 1189.

The case at bar presents even stronger facts than were present in Data General. As in Data General, here the equipment owner has the option of ordering the PBX repair parts and then asking an ISO to install them. In addition, here an equipment

12

owner can also provide an ISO with a letter of agency such that the ISO may order the part from Siemens and carry out the installation–an option not available in Data General. Applying the Data General rationale, we conclude that there is not actionable harm to consumers and therefore the ISOs have failed to prove a violation of § 2 of the Sherman Act with respect to the parts policy.

(b) Copyrighted Software

The ISOs also contend that Siemens violated § 2 of the Sherman Act by using its reconfiguration software to control PBX operating system updates. There are two types of software at issue here. First, Siemens licenses operating system software along with sales of the PBXs to all end users and to licensed distributors of its products. This software is necessary for the PBXs' operation. Second, Siemens has reconfiguration software which can modify and activate features in the operating system software. Siemens does not license or sell its reconfiguration software to anyone, as that software allows Siemens to control the licenses it extends to users and distributors for its PBX operating system. Siemens also uses this reconfiguration software to update its users' operating system software as such updates become available, for an additional licensing fee. The ISOs contend that Siemens used its control over the reconfiguration software to prevent ISOs from performing necessary software updates for equipment owners, and that this behavior constitutes a

13

monopolization of the service market.

The Copyright Act gives copyright owners the exclusive right to distribute protected works by "transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. As other circuit courts have recognized, this right potentially conflicts with the Sherman Act. See Kodak II, 125 F.3d at 1215; Data General, 36 F.3d at 1187.[8]

We need not address this potential conflict here, as the present case involves a different type of software than was at issue in Data General and Kodak II. In both those cases, the software was diagnostic software which technicians used to assist in their service efforts. See Kodak II, 125 F.3d at 1214; Data General, 36 F.3d at 1152. That software was copyrighted material which served to make its owner or licensee competitive in the *service* market for the defendant's products. By contrast, the software at issue in the present case has no diagnostic or repair function; it is operating system software which operates the PBX hardware and proprietary reconfiguration software which allows Siemens to control its licenses on the operating system software. The software helps to make Siemens competitive in the

_____

[8] Both the First and Ninth Circuits have found that a copyright owner is entitled to a rebuttable presumption that its refusal to deal copyrighted material is based on a legitimate business justification, and therefore not in violation of § 2 of the Sherman Act. Kodak II, 125 F.3d at 1218; Data General, 36 F.3d at 1187. The Ninth Circuit went further, finding that the presumption had been rebutted by "evidence of pretext," and finding a Sherman Act violation. Kodak II, 125 F.2d at 1219. In the court's words, "[n]either the aims of intellectual property law, nor the antitrust laws justify allowing a monopolist to rely upon a pretextual business justification to mask anticompetitive conduct." Id. The First Circuit reached the opposite result, finding that in its case the presumption was not rebutted and the Sherman Act not violated. Data General, 36 F.3d at 1187-89.

14

*product* market for PBX products. Neither type of software, however, is intended to help diagnose problems and make repairs. Thus, the software does not give Siemens a competitive advantage in the *service* market. As such, Siemens' refusal to deal its copyrighted material cannot constitute a violation of § 2 of the Sherman Act with respect to the market for service.

For the forgoing reasons, we affirm the district's grant of summary judgment in favor of Siemens. Because we affirm the grant of summary judgment, we do not reach the plaintiffs' claim that the district court erred in denying them class status.

III. The Jury Verdict for Siemens on its Counterclaims.

The ISOs also appeal the jury verdict for Siemens on patent and copyright infringement. For the reasons that follow, we affirm the jury verdict.

1. Ownership of the PBX Copyrights and Patents

The ISOs begin by appealing the district court's holding that Siemens owned the copyrights and patents at issue in this case and, thus, had standing to bring these infringement claims.[9] The ISOs claim that the relevant intellectual property was not properly transferred from the Rolm Company Partnership to Siemens Rolm

---

[9] We review issues of law de novo and a district court's findings of fact for clear error. SunTrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1260 (11th Cir. 2001).

15

Communications, Inc.

The original owner of the intellectual property was the Rolm Company, a Delaware partnership. The partners signed a subscription agreement to convert the partnership into a Delaware corporation. The appellants argue that Delaware law does not permit the merger of partnerships into corporations without a "winding up," which Rolm Company did not complete. The ISOs contend that, without a "winding up," Rolm Company never transferred its intellectual property rights to the Siemens Rolm Corporation, and, thus Siemens does not own the patents and copyrights.

The district court found, and we agree, that where all of the partners directly exchange their partnership interest for shares in the corporation, the partnership ends without a "winding up" and all of the assets of the partnership transfer directly to the corporation. Delaware law is silent on the issue, so the district court looked to the rules of other jurisdictions as well as treatises and found that a winding up period is not required. See Carnes v. McNeal, 479 S.E. 2d 474 (Ga. Ct. App. 1996); Judelson v. Weintraub, 55 A.D. 2d 906, 390 N.Y.S.2d 455 (2d Dep't 1977); Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership, Vol. 2, Rel. 6 Suppl., p. 281-82 (1999). We affirm the district court's finding that Siemens owns the intellectual property rights originally established by the Rolm Company Partnership.

2. Evidence of Contract Terms

The jury found that the ISOs violated copyright and patent law by distributing additional software to existing Siemens customers who had not licensed the additional software from Siemens. For instance, a customer could license a Siemens PBX with limited capabilities for a certain price, and Siemens alleged that the ISOs would then install copied software on the PBX that the customer did not pay to license. At trial, the ISOs defended their distribution of Siemens's copyrighted software by arguing that Siemens had sold its software. Under the "first sale" defense, a sale of the software would protect the ISOs from a copyright infringement suit. In rebuttal, Siemens presented testimony and unexecuted contracts, as evidence of its policy to license, rather than sell, its software.

The ISOs argue that the district court erred by allowing Siemens to present the unexecuted copies of its licensing contracts instead of the actual contracts in violation of the "best evidence" rule. The ISOs argue admission of these contracts prejudiced their case because the contracts varied widely and the ISOs could not examine Siemens's witnesses concerning the specifics of individual contracts.

We review evidentiary rulings for abuse of discretion, United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000), and find that the district court did not err in admitting these contracts. The best evidence rule applies where the party presenting evidence seeks to prove the specific contents of a writing. See Allstate Ins. Co. v.

17

<u>Swann</u>, 27 F.3d 1539, 1543 (11th Cir. 1994) . Here, the rule is inapplicable because Siemens sought to prove its policy of leasing software, not the terms of its contractual relationship with any one client. <u>See</u> <u>id.</u> (finding that the best evidence rule should not have prevented an insurance company employee from testifying about the company's policy); <u>see also</u> <u>United States v. Castro</u>, 89 F.3d 1443, 1455 (11th Cir. 1996) (finding that the best evidence rule did not prevent the government from using testimony, rather than a detailed federal fund report, to show that a county received federal grants). As such, Siemens could prove its licensing policy through testimony, which it also presented, *or* documentary evidence. Because Siemens sought to demonstrate a company policy, not specific terms of any contract, the district court did not err and the ISOs were not prejudiced.

3. "Distribution Infringement" Damages

The ISOs appeal the award of damages for their copyright infringement claiming that the damages were too speculative. The district court charged the jury to award damages based on "the amount of an ISO's profits that were gained because of the infringement." In a separate holding, the district court found that Siemens had not lost sales based on the infringement. For example, Siemens did not necessarily lose sales because the ISOs gave customers more capabilities than the customer had

18

licensed from Siemens – the customer might not have ordered those capabilities if it had to pay for them. The ISOs use this secondary holding to argue that if the district court found that Siemens did not lose sales, then the necessary corollary is that the ISOs did not *profit* as a result of the infringement. We reject this argument and affirm the decision of the district court.

We review Rule 50 motions de novo and apply the same standard as the district court. Russell v. North Broward Hosp., 346 F.3d 1335, 1343 (11th Cir. 2003). In doing so, we draw all inferences in favor of the non-moving party. Id. We affirm the jury verdict unless there is no legal basis upon which the jury could have found for Siemens. See id. The district court instructed the jury that Siemens had the burden of proving that the ISOs profited from their unlicensed transfer to customers. Siemens presented evidence at trial that the ISOs were selling used PBX parts that were running unlawfully copied Siemens software, and that the ISOs would not have made many of their equipment sales without this copyright infringement. The jury evidently credited this evidence because it returned a verdict for Siemens and awarded damages. Given the evidence presented, we hold that the jury verdict is reasonable.

4. Misuse Defense

The ISOs next appeal the district court's decision to include their claims of

copyright and patent misuse in the antitrust proceeding, rather than as a defense in the trial on the infringement counterclaims. The ISOs argue that they presented questions of fact as to whether Siemens misused its copyrights and patents by extending their copyrights and patents beyond established legal limits. In essence, the ISOs wanted to be able to argue in the counterclaims trial that Siemens engaged in activities similar to leveraging and tying that are impermissible uses of copyright under antitrust laws.

This circuit has not recognized, but has not rejected, misuse as a defense for infringement suits. In <u>BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub.</u>, 933 F.2d 952, 960-61 (11th Cir. 1991), this court found that there was a copyright infringement and discussed the conditions under which a company could misuse its copyright protection:

> The antitrust misuse defense is an established defense to patent infringement. The policy supporting the patent misuse defense lies in the equitable clean hands doctrine. A patentee who comes into court, praying that defendant's patent infringement be enjoined will not be gratified if he is guilty of abusing his patent rights. Some courts have concluded that a misuse of copyright defense is inherent in the law of copyright just as a misuse of patent defense is inherent in patent law. Although the patent misuse defense closely fits the copyright law situation and may someday be extended to discipline those who abuse their copyrights, we decline to extend the application in the context before us because there is no antitrust violation. (Footnotes omitted.)

This decision, however, was vacated and reversed en banc. <u>BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub.</u>, 999 F.2d 1436 (11th Cir. 1993). The en banc court

20

found that there was no copyright infringement and, therefore, never reached the issue of whether to recognize a misuse defense. Id. Similarly, we need not reach the issue of copyright abuse here. Even if such a defense exists, it would not help the ISOs because we conclude that Siemens's actions do not violate intellectual property or antitrust law.

5. Sufficient Evidence for the Patent Infringement Claims

The jury found that the ISOs had infringed on Siemens's patents by illegally copying and selling Siemens's software that included one or more of Siemens's patents without a license from Siemens. The ISOs argue that Siemens failed, as a matter of law, to present sufficient evidence to support a jury verdict of patent infringement.[10]

The ISOs first argue that, under the doctrine of "first sale," Siemens had exhausted its patent when it sold its hardware and that this "first sale" defense was improperly rejected by the jury. The argument is not on point, however, because Siemens presented evidence to the jury that it had instituted valid restrictions on the sale or license of its patented products. Thus, a reasonable jury could reject the "first sale" defense and find that the ISOs had violated Siemens's patents.

_____

[10] We review Rule 50 motions de novo and apply the same standard as the district court. Russell, 346 F.3d at 1343. We draw all inferences in favor of the non-moving party. Id. We affirm the jury verdict unless there is no legal basis upon which the jury could have found for Siemens. See id.

The ISOs next argue that there was insufficient evidence for five of the elements necessary to prove patent infringement. The elements are: (1) Siemens failed to prove what versions of its patented Phonemail system were illegally transferred, (2) Siemens failed to show that the ISOs used its patented methods, (3) Siemens could not establish patent liability based on "mismatch,"[11] (4) Siemens could not establish liability based on the unauthorized "feature activation," and (5) Siemens failed to prove that the infringement took place after the ISOs received notice of possible liability.

The district court held that Siemens presented evidence that its software was copied and distributed without its actual or implied authorization. At trial, Siemens presented evidence that it owned three patents that cover its Phonemail software. Siemens also presented testimony from ISO representatives that they had installed copies of the Phonemail software and activated features without authorization from Siemens. Furthermore, Siemens presented evidence that the ISOs copied 9000 and 9751 PBX software and used Siemens's patented methods of testing software. The district court found this to be sufficient evidence of patent infringement and we

_____

[11] Siemens assigns a serial number to all of its hardware and coordinates that number to the software license for that specific system. If software is installed on the hardware that does not match the serial number, then Siemens knows that someone has copied its software and installed it on the hardware. When the serial numbers on the hardware and software are not coordinated, this is called a "mismatch."

22

agree.[12]

## 6. The Copyright Claim

The jury also found that the ISOs had illegally copied Siemens's software and distributed the software to customers without a license to do so. The ISOs now argue that this claim should not have been presented to the jury because the judge should have ruled that Siemens's software was in the public domain. The ISOs argue that Siemens failed to attach a copyright notice to each disk containing copyrighted programs, and, thus, these works entered the public domain. Although Siemens's software does not carry a copyright notice, the hardware containing the software does. Anyone seeking to copy the software would necessarily view the notice affixed to the hardware. The ISOs contend that this notification of copyright is insufficient under the Copyright Act, 17 U.S.C. § 401(a), which applies to publicly-distributed copyrighted work.[13]

We reject this argument and affirm the district court's holding. The jury found that the copyrights held by Siemens were valid. It could have reasonably reached this

---

[12] In its jury instructions, the district court covered, in detail, the necessary evidence for a findings of patent infringement and the ISOs did not object to any of these instructions.

[13] § 401. Notice of copyright: Visually perceptible copies

(a) General provisions. Whenever a work protected under this title is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section may be placed on publicly distributed copies from which the work can be visually perceived, either directly or with the aid of a machine or device. (Emphasis added.)

determination either by finding that Siemens issued its work in a limited publication (exempting it from § 401), or by finding that the work contained adequate notification.[14] Siemens presented sufficient evidence to support both of these theories. As such, we see no reason to disturb the jury verdict.

## 7. The Trade Secret Misappropriation Claim

The jury found that three of the ISOs had misappropriated Siemens's trade secrets by wrongfully acquiring passwords to activate additional Siemens features. The first ISO, Realcom, argues that evidence that one of its employees used his knowledge from his previous employment with Siemens to transfer passwords was "mere speculation." Siemens, however, provided evidence that Realcom could only gain access to Siemens's passwords maintenance-level passwords by using higher-level engineering passwords from the employee. This is sufficient evidence to support the jury verdict.

The two other ISOs, ATC and TTSI, claim that the jury verdict against them was in error because they did not use any passwords. ATC was found to use RCTL, a computer program, to activate certain Siemens features. ATC argues that the use

---

[14] The district court noted, and we agree, that regulations relating to the Copyright Act permit some flexibility in how copyright owners must mark their protected works. See 37 C.F.R. 201.20(g)(4)(permitting copyright notice to be affixed to containers that are permanent receptacles for the software copies). Because different work is transferred or leased in varying forms of media, the best way to notify a user of the copyright protections may vary. Here, Siemens affixed copyright notices to hardware cards contained with the PBX system. Anyone who tried to copy the software would see these cards.

of RCTL alone does not show that it knowingly used Siemens's passwords, and, thus, does not prove that it appropriated trade secrets. TTSI argues that it never used RCTL to activate features–it only sold a PBX system to another ISO who did so. Siemens, however, presented evidence that the only way to activate features in the Siemens PBX system was to use its passwords and that ATC and TTSI purchased the RCTL program to attain these passwords. This is sufficient evidence for the jury to find ATC and TTSI knew that the RCTL program was unlawful.

8. Tortious Interference of Contract Claim

Finally, the ISOs finally argue that Siemens's state law tortious interference with contract claim involves the same conduct as the copyright infringement claim and, thus, is preempted by federal copyright law. See Crow v. Wainwright, 720 F.2d 1224 (11th Cir. 1983).[15] If, however, the state law involves different or additional

_____

[15] In Crow, this court found that Florida could not criminally prosecute Crow for selling copied Tammy Wynette eight-tracks because § 301 of the Copyright Act preempts state law remedies that are equivalent to the exclusive rights under § 106 of the Copyright Act. Id. at 1225-26, see 17 U.S.C. § 106 (2004). § 106 states:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>   (1) to reproduce the copyrighted work in copies or phonorecords;
>   (2) to prepare derivative works based upon the copyrighted work;
>   (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>   (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>   (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>   (6) in the case of sound recordings, to perform the copyrighted work publicly by means

elements for recovery, then it is not preempted because it is not the same action. See

Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1549 (11th Cir. 1996). The district court

found, and we agree, that the tortious interference claim involves an additional

element. The tortious interference claim requires Siemens to demonstrate that the

ISOs violated the terms of Siemens's software license for third parties, which is an

element beyond federal copyright law that prohibits unauthorized copying. See Nat'l

Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 433 (8th Cir.

1993). As such, the state law claim is not preempted because the claim at issue is not

equivalent to the claim under § 106.

For the above reasons, we AFFIRM the judgments of the district court.

---

of a digital audio transmission.