# United States Court of Appeals for the Federal Circuit

05-1241, -1267, -1588


GO MEDICAL INDUSTRIES PTY, LTD.
and ALEXANDER G.B. O'NEIL,

Plaintiffs-Appellants,

v.


INMED CORPORATION (doing business as Rüsch),

Defendant-Cross Appellant,

and

ALPINE MEDICAL, INC.
(formerly known as Medical Marketing Group, Inc.),

Defendant-Cross Appellant.


Patrick J. Flinn, Alston & Bird, LLP, of Atlanta, Georgia, argued for plaintiffs-appellants. With him on the brief were Robin L. McGrath, Angela Payne James and Andrew J. Wilson.

William K. West, Jr., Howrey LLP, of Washington, DC, argued for defendant-cross appellant Inmed Corporation. Of counsel on the brief were Juliana M. Cofrancesco, Susan M. Kayser and Jim W. Ko.

Ron L. Quigley, Davis, Matthews & Quigley, P.C., of Atlanta, Georgia, argued for defendant-cross appellant Alpine Medical, Inc. Of counsel was Charles E. Campbell, McKenna Long & Aldridge, LLP, of Atlanta, Georgia.

Appealed from: United States District Court for the Northern District of Georgia

Judge Thomas W. Thrash, Jr .

# United States Court of Appeals for the Federal Circuit

05-1241, -1267, -1588

GO MEDICAL INDUSTRIES PTY, LTD.
and ALEXANDER G.B. O'NEIL,

Plaintiffs-Appellants,

v.

INMED CORPORATION (doing business as Rüsch),

Defendant-Cross Appellant,

and

ALPINE MEDICAL, INC.
(formerly known as Medical Marketing Group, Inc.),

Defendant-Cross Appellant.

_____

DECIDED:  October 27, 2006

_____


Before MICHEL, <u>Chief Judge</u>, ARCHER, <u>Senior Circuit Judge</u>, and LINN, <u>Circuit Judge</u>.

MICHEL, <u>Chief Judge</u>.

Go Medical Industries, Pty., Ltd. and Dr. Alexander G.B. O'Neil (collectively "Go") appeal from a final judgment of the United States District Court for the Northern District of Georgia.  Go challenges orders (1) granting its motion for summary judgment of patent infringement but finding, inter alia, that the asserted claims were invalid as anticipated because Go was not entitled to claim the priority date of an earlier

application, Go Medical Indus. Pty., Ltd. v. Inmed Corp., No. 01-CV-313 (N.D. Ga. July 9, 2003) ("SJ Order"); (2) denying its motion for prejudgment interest, Go Medical Indus. Pty., Ltd. v. Inmed Corp., No. 01-CV-313 (N.D. Ga. Sept. 30, 2004) ("Prejudgment Interest Order"); and (3) reducing the jury's award of damages on Go's claims for trademark infringement and breach of contract upon granting judgment as a matter of law ("JMOL"), Go Medical Indus. Pty., Ltd. v. Inmed Corp., No. 01-CV-313 (N.D. Ga. Jan. 25, 2005) ("First JMOL Order"). Specifically, Go argues that (1) the district court erred in granting summary judgment on the patent claim because there were factual disputes as to whether the earlier patent application met the requirements of 35 U.S.C. § 112; (2) prejudgment interest should have been awarded because the contract damages were liquidated; and (3) the damages award should not have been reduced.

Inmed Corporation, doing business as Rüsch, International ("Rüsch"), and Alpine Medical, Inc., formerly known as Medical Marketing Group, Inc. ("MMG"), separately cross-appeal. Rüsch contends that the district court erred in entering a permanent injunction, Go Medical Indus. Pty., Ltd. v. Inmed Corp., No. 01-CV-313 (N.D. Ga. Sept. 30, 2004) ("Injunction Order"), because Go had no trademark rights in the surname "O'Neil." MMG, on the other hand, asserts that (1) public policy bars Go's claims; (2) the district court erred in denying its second motion for JMOL requesting elimination of all the contract damages, Go Medical Indus. Pty., Ltd. v. Inmed Corp., No. 01-CV-313 (N.D. Ga. Aug. 5, 2005) ("Second JMOL Order"); and (3) there can be no implied trademark license of a surname that has not achieved secondary meaning.

As described in further detail below, we conclude that the district court misapplied the doctrine first set forth by Lear, Inc. v. Adkins, 395 U.S. 653 (1969), in reducing the damages for MMG's breach of contract. On all other issues, however, we find no reversible error. We thus affirm-in-part, vacate-in-part, and remand for a recalculation of damages.

## I.    BACKGROUND

Urinary catheters typically increase the risk of urinary tract infections because inserting a catheter can push bacteria into the normally sterile bladder. Most of the bacteria are concentrated in the first 1.5 cm to 2 cm of the urethra, due to a natural pressure barrier located about 1.5 cm from the outer end.

Dr. O'Neil invented a catheter with a sheath that does not extend beyond this pressure barrier—thus reducing the likelihood of contamination caused by the sheath itself—and obtained United States Patent No. 4,652,259 ("the '259 patent") in 1987. The '259 patent was issued from a 1985 continuation-in-part application that claimed the priority date of an application filed on September 12, 1979.[1] The claims of the '259 patent recite the use of a stop member to limit the insertion of the sheath to either "about 1.5 cm" or moving the sheath along the urethra such that the distal end is in a "known position of maximum pressure," but not beyond that position.

Go Medical Industries, Pty., Ltd., founded by Dr. O'Neil in 1982, is an Australian limited liability company that manufactures and markets the type of urinary catheters

---

[1] The original 1979 application was not limited to urinary catheters; instead, the claims were drafted broadly to include a variety of medical instruments "for insertion into a body passage." The examiner repeatedly rejected the claims as anticipated or obvious over the prior art, and the application was subsequently abandoned. Dr. O'Neil also filed continuation applications in 1981 and 1984, but both were eventually abandoned as well.

described in the '259 patent. Go's products were initially distributed in the United States by Penine Healthcare, a medical manufacturing and supply company based in the United Kingdom.

In 1988, Go and MMG entered into a 99-year contract that gave MMG the exclusive right to distribute such catheters within the United States. The agreement provided that Go and MMG would share the net profits equally. At first, MMG purchased products from Go, but, for various reasons, soon started manufacturing catheters itself and selling them as "MMG/O'Neil" catheters. MMG registered the "MMG/O'Neil" trademark on January 12, 1993.

Starting in 1991, MMG began paying Go 7% of gross sales on the "MMG/O'Neil" catheters in lieu of 50% of net profits, although it was later revealed that this amount was not equivalent. In 1997, the 1988 agreement was amended. Significantly, the parties agreed that 7% of the gross sales "represent[ed] Go Medical USA's 50% net profit share." The term of the contract was also reduced from 99 years to the life of the '259 patent. Finally, the 1997 amendment explicitly provided that the parties would share any intellectual property enforcement costs. Both the 1988 agreement and the 1997 amendment were silent on whether MMG was also licensing the right to use the "O'Neil" name on its catheters.

In 1992, MMG urged Go to sue when C.R. Bard entered the market with a competing catheter. Go alleges that MMG refused to share in the costs of litigation, despite their contractual obligation to do so. In March 1999, the district court granted summary judgment in favor of C.R. Bard, finding the '259 patent unenforceable due to

inequitable conduct and invalid as anticipated.[2]  On August 1, 2000, this court reversed and remanded for further proceedings.  Go Medical Indus. Pty., Ltd. v. C.R. Bard, Inc., 250 F.3d 763, 2000 WL 1056063 (Fed. Cir. 2000) (unpublished table decision).  That case settled shortly thereafter.

Meanwhile, in a letter dated June 21, 1999, MMG notified Go that it believed they "no longer ha[d] a contract" since the district court had found the '259 patent invalid.  Consequently, it started placing its royalty payments in escrow around April 1999.  In August 1999, Go terminated the agreement and demanded that MMG cease using the "O'Neil" trademark.  MMG refused and continued to sell "MMG/O'Neil" catheters even after it sold its assets to Rüsch in February 2000 for $38 million.  In 2003, however, Rüsch changed the name of its catheters to "Rüsch/MMG."

*      *      *

On February 1, 2001, Go sued MMG and Rüsch in the United States District Court for the Northern District of Georgia.  Go alleged patent infringement, breach of contract, tortious interference with contract, conspiracy to breach fiduciary duty, trademark infringement, and unfair competition.

On July 3, 2003, the district court granted summary judgment in favor of MMG and Rüsch, finding the '259 patent infringed, but invalid as anticipated.  The parties agreed that a 1982 article written by Dr. O'Neil anticipated the '259 patent if Go could

---

[2]     During the course of that litigation, Go corrected two gaps in co-pendency of the chain of applications leading up to the '259 patent so it could claim the benefit of the 1979 filing date.  Go had conceded that the '259 patent was otherwise anticipated by the 1980 publication of Dr. O'Neil's U.K. patent application.  C.R. Bard alleged that Dr. O'Neil misrepresented when he first became aware that the 1979 application had been abandoned, such that his petition to revive that application was not timely filed.  See Go Medical Indus. Pty., Ltd. v. C.R. Bard, Inc., 250 F.3d 763, 2000 WL 1056063, at *2-5 (Fed. Cir. 2000) (unpublished table decision).

not claim the 1979 priority date. SJ Order, slip op. at 4-5. The court concluded that Go was not entitled to claim the benefit of that filing date because the 1979 application did not satisfy the written description or best mode requirements under 35 U.S.C. § 112, ¶ 1. Id., slip op. at 6-16. It denied summary judgment on the issue of enablement, however, because there remained a genuine factual dispute whether the amount of experimentation required to practice the invention was undue. Id., slip op. at 16-18.

In addition, the court granted summary judgment in favor of Go on the inequitable conduct issue, concluding that there was insufficient evidence to support a finding of material misrepresentation in light of the Federal Circuit's decision in the previous litigation. Id., slip op. at 22-31. The district court further granted summary judgment in favor of MMG and Rüsch on lost profits, finding that Go could not satisfy the four-factor test for recovering lost profits for patent infringement. Id., slip op. at 39-47.

As for the trademark claims, MMG and Rüsch had themselves asserted a likelihood of confusion between "O'Neil" and "MMG/O'Neil" in their trademark counterclaims; the court found this to constitute a judicial admission on that issue. Id., slip op. at 38-39. Yet, the district court denied summary judgment because there remained questions of triable fact as to whether "O'Neil" had acquired secondary meaning, whether the agreement between the parties included an implied trademark license, and whether the "O'Neil" mark was abandoned due to naked licensing. Id., slip op. at 31-38.

In February 2004, the case proceeded to trial. At the close of plaintiff's case, the district court granted JMOL on Go's claims for the breach of fiduciary duty and tortious interference with contract. This ruling is not being appealed. At the close of evidence,

MMG and Rüsch made motions for JMOL under Rule 50(a), which were denied. The jury returned a verdict in favor of Go. On the breach of contract claim against MMG, the jury awarded $6,156,571. On the trademark infringement claim against MMG, the jury awarded $350,838 as a reasonable royalty, $3,873,236 for unjust enrichment, and $19,000,000 in punitive damages. As for the trademark infringement claim against Rüsch, the jury awarded $2,672,419 as a reasonable royalty and $32,265,634 for unjust enrichment. MMG and Rüsch both challenged these damages awards with renewed motions for JMOL under Rule 50(b).

On September 30, 2004, the district court denied Go's motion for prejudgment interest. The court found that the contract claim was not a liquidated claim; it further declined to award prejudgment interest on the Lanham Act claim. Prejudgment Interest Order, slip op. at 1. The same day, the court granted Go's motion for a permanent injunction and prohibited MMG and Rüsch from using "O'Neil" or any confusingly similar mark. Injunction Order, slip op. at 2.

On January 25, 2005, MMG's motion for JMOL was granted-in-part and denied-in-part; Rüsch's motion was also granted. See First JMOL Order. The district court applied the Lear doctrine to preclude royalties owed after March 1999 (when the '259 patent was found invalid in the litigation against C.R. Bard) and reduced MMG's contract damages accordingly. Id., slip op. at 6-11.

As for the trademark damages, the court characterized the jury's reasonable royalty award as recovery based on profits rather than actual damages (and thus subject to reduction in accordance with the principles of equity) because it was based on a wholly speculative royalty rate that Go's expert "arbitrarily pulled out of the air." Id.,

slip op. at 16. The court also exercised its discretion under the Lanham Act to set aside the jury's award of lost profits, id., slip op. at 17-22, and expressly rejected Go's argument that the jury awarded lost profit damages under common law. Id., slip op. at 22-23. The court further reasoned that the award of punitive damages against MMG (which allegedly infringed for six months), but not Rüsch (which allegedly infringed for forty months), suggested that the jurors were punishing MMG for actions relating to its breach of contract, which was not permitted by O.C.G.A. § 13-6-10. Id., slip op. at 24-25. The court concluded that the jury, which had not been told that the '259 patent was ruled invalid, was "obviously swayed" by counsel's argument that MMG had stolen Dr. O'Neil's invention as well as "the mass of irrelevant and prejudicial evidence that was admitted during the trial." Id., slip op. at 26.

In a separate order, also dated January 25, 2005, the court found that this case was not exceptional and denied Go's motion for attorney's fees. This ruling is not being challenged on appeal.

On February 10, 2005, final judgment was entered. A timely appeal and cross-appeals followed. On February 25, 2005, however, MMG filed another JMOL motion, challenging the breach of contract damages. In April 2005, this court deactivated the notice of appeal to allow the district court an opportunity to dispose of this last outstanding motion. On August 5, 2005, the district court rejected MMG's additional arguments concerning various contractual provisions and denied the motion. Second JMOL Order, slip op. at 7-12. The notice of appeal was reactivated on August 17, 2005. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Patent Invalidity

A district court's grant of summary judgment on the issue of patent invalidity is reviewed without deference. Augustine Med., Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1302 (Fed. Cir. 1999). Here, Go conceded that a 1982 article written by Dr. O'Neil fully anticipated the '259 patent if it was not entitled to claim the filing date of its original 1979 application. Whether a patent is entitled to an earlier priority date is also reviewed without deference. In re Daniels, 144 F.3d 1452, 1455 (Fed. Cir. 1998).

A patent application for an invention disclosed in a previously-filed application in a manner that satisfies all the requirements of 35 U.S.C. § 112 is entitled to the benefit of the earlier filing date. 35 U.S.C. § 120. A continuation-in-part application "contains subject matter from a prior application and may also contain additional matter not disclosed in the prior application." Augustine, 181 F.3d at 1302. New subject matter does not receive the benefit of the earlier priority date. Id.

The claims of the '259 patent require the catheter sheath to be inserted "about 1.5 cm" or up to (but not beyond) a "known position of maximum pressure." The specification of the 1979 application discloses that "the stop means can be set [at] a predetermined distance along the sheath depending on the usual extent of bacteria within the passage." Figure 1, shown here, "is a schematic diagram showing the distribution of bacteria in a female urethra."



The specification further discloses that the sheath should be inserted "to an extent whereby its distal end penetrates beyond bacteria disposed adjacent the proximal end of the passage," such that in at least one embodiment, the distal end of the cover is at the area marked "X" in Figure 1.

In determining whether the best mode requirement of 35 U.S.C. § 112, ¶ 1 is met, we first determine whether Dr. O'Neil subjectively considered a particular mode of practicing the invention to be superior to all other embodiments at the time the 1979 application was filed. See, e.g., Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1223 (Fed. Cir. 2006). If so, we then ask whether he provided a sufficient disclosure to allow others to practice that best mode. Id.

As to the first prong of this test, Dr. O'Neil admitted during his deposition that at the time he filed his patent application in 1979, he had already made sample catheters where the distance from the stop member to the distal end of the sheath was 1.5 cm. He further characterized it as "the preferred embodiment at that stage." O'Neil Dep. 228:12-14, Sept. 21, 1994. The '259 patent, at col.2, ll.65-69, describes this distance as "crucial" to preventing bacteria from being pushed into the bladder by the catheter or by the sheath itself. The district court thus correctly concluded that Dr. O'Neil possessed a best mode—i.e., a sheath length of 1.5 cm. SJ Order, slip op. at 13.

We also agree with the district court that the 1979 application lacked sufficient disclosure to allow others to practice the best mode. Id., slip op. at 14. There is no dispute that the preferred length of 1.5 cm was not expressly disclosed. Dr. O'Neil even testified at his deposition that when drafting the 1979 application, he purposely

"avoid[ed] any comment with relation to length" because he "was aware that numbers would become limiting themselves."  O'Neil Dep. 228:23-229:6.

Nor were the drawings submitted with the 1979 application sufficient.  There is no indication that Figure 1 was drawn to any particular scale, much less one where the distance between the "X" and the outer end of the urethra is exactly 1.5 cm.  "[P]atent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."  Hockerson-Halberstadt, Inc. v. Avia Group. Int'l, Inc., 222 F.3d 951, 956 (Fed. Cir. 2000); see also In re Wright, 569 F.2d 1124, 1127 (C.C.P.A. 1977) ("Absent any written description in the specification of quantitative values, arguments based on measurement of a drawing are of little value.").

Moreover, Dr. O'Neil also testified that "[i]t took [him] a few weeks of experiments to define the distance" and others would "have to do a small amount of experimental work" to reach the same conclusion.  O'Neil Dep. 229:12-19.  In other words, one of ordinary skill would not know from reading the 1979 application that the preferred length between the stop member and the distal end of the sheath was 1.5 cm.

In sum, we conclude that the invention of the '259 patent was not disclosed in the 1979 application in a manner that satisfies the best mode requirement—and no reasonable jury could find otherwise—such that Go is not entitled to claim the priority date of that application.  Thus, the 1982 article anticipates.  In light of this ruling, we need not address whether the district court erred in finding that the 1979 application also failed to meet the written description requirement.  We affirm the grant of summary judgment of patent invalidity.

## B.    Prejudgment Interest

On procedural issues not unique to patent law, we apply the standard of review of the regional circuit.  Sulzer Textil A.G. v. Picanol N. V., 358 F.3d 1356, 1363 (Fed. Cir. 2004).   The denial of prejudgment interest is reviewed for abuse of discretion. Smith v. Am. Int'l Life Assurance Co., 50 F.3d 956, 958 (11th Cir. 1995).

The relevant statute provides:

> In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery.

Ga. Code Ann. § 20-1408 (emphasis added).   Because an award of prejudgment interest is intended to be compensatory rather than punitive, equitable considerations should be evaluated by the district court.  Osterneck v. E.T. Barwick Indus., Inc., 825 F.2d 1521, 1536 (11th Cir. 1987).

The district court did not err in concluding that the alleged contract damages were not liquidated because the amount owed to Go was not ascertained until the jury's verdict was rendered.  In other words, the royalties due under the license (i.e., 50% profits versus 7% gross sales, depending on how the contract was interpreted by the jury) was in dispute.  Neither the 1988 agreement nor the 1997 amendment contained a liquidated damages provision.  We also find that the district court did not abuse its discretion in declining to award prejudgment interest on Go's claim under the Lanham Act.  We therefore affirm the denial of prejudgment interest.

## C.    Damages

We now consider whether the district court erred in reducing the jury's contract and trademark damages.  Judgment as a matter of law is appropriate when "a party has

been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). We review the grant or denial of JMOL de novo, by reapplying the same standard used by the district court. Telecom Tech. Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004).

As a preliminary matter, Go argues that a district judge may not rely on new grounds not raised in a Rule 50(a) to set aside the jury's verdict. Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998). It would have been impossible, however, for MMG and Rüsch to challenge the jury's award of damages as excessive in a Rule 50(a) motion. By definition, such a motion is made "before submission of the case to the jury." Fed. R. Civ. P. 50(a). Moreover, Go failed to object to the Rule 50(b) motions on this procedural ground and cannot do so for the first time on appeal.

**1.     Breach of Contract**

In Lear, the Supreme Court held that a licensee was not estopped from challenging the validity of the licensor's patent. 395 U.S. at 671. For various policy reasons, a licensee may cease payments due under a license—i.e., contractual royalty provisions will not be enforced—during the time it is challenging patent validity in the courts. Id. at 673. Our court has since clarified that the Lear doctrine does not prevent a patentee from recovering royalties until the date the licensee first challenges the validity of the patent. Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F.3d 1561, 1568 (Fed. Cir. 1997). In other words, a licensee "cannot invoke the protection of the Lear doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice

to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid." Id.[3]

The district court erred in applying the Lear doctrine to relieve MMG of the obligation to pay any royalties after the finding of patent invalidity during Go's litigation against C.R. Bard in March 1999. That ruling had no effect on the contractual relationship between Go and MMG. Although the 1997 amendment tied the term of the contract to the life of the '259 patent, the license did not automatically terminate with the district court's ruling, as MMG believed, because the invalidity finding was still pending appeal. In fact, MMG's June 21, 1999 letter to Go stated that it was placing its royalty payments "in an escrow account until such time as the appeal is decided" (emphasis added). This was an implicit acknowledgment that Go was entitled to the royalty payments, meaning the funds would be transferred out of escrow, in the event that the district court's invalidity finding was reversed.

Moreover, MMG's June 21, 1999 letter did not state that its reason for ceasing payment of royalties was that it deemed the '259 patent to be invalid. Instead, it merely indicated that MMG was placing its royalty payments in escrow until the validity of the patent was resolved on appeal. (Even if it had been sufficient to constitute the requisite notice, the district court still erred in finding that Lear relieved MMG from all royalty payments after March 1999 instead of the date of this notice—i.e., June 1999.)

MMG is trying to have it both ways. As the exclusive U.S. distributor of the urinary catheter described in the '259 patent, MMG not only urged Go to sue C.R. Bard, but was the primary beneficiary when we later reversed the invalidity finding from that

_____

[3] During oral argument, MMG conceded that, in light of Shell Oil, the Lear doctrine did not preclude all contract damages, as it had argued in its briefs.

litigation. Significantly, it did <u>not</u> file its own declaratory judgment suit to challenge the patent's validity after it learned about the district court's March 1999 ruling. Indeed, until the agreement was terminated by Go in August 1999, MMG was contractually obligated to share the costs of enforcing the '259 patent, including the costs of pursuing the appeal.

Because the district court misapplied the <u>Lear</u> doctrine, we vacate and remand for a recalculation of the contract damages.

### 2. Trademark Infringement

The relevant section of the Lanham Act provides:

(a) Profits; damages and costs; attorney fees. When a violation of any right of the registrant of a mark . . . shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of . . . [15 U.S.C. §§ 1111, 1114], and <u>subject to the principles of equity</u>, to recover (1) defendant's <u>profits</u>, (2) any <u>damages</u> sustained by the plaintiff, and (3) the <u>costs</u> of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. <u>In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.</u> Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117 (emphasis added).

First, we agree with the district court that § 1117 does not allow for a downward adjustment of actual damages. The jury's award of a reasonable royalty, however, was not based on substantial evidence of actual damages. There was no evidence of an

explicit agreement setting forth a royalty rate for use of the "O'Neil" name on catheters. Rather than analyze how much MMG would have agreed to pay as a trademark royalty in a hypothetical negotiation, Go's expert merely considered MMG's excess earnings and attributed 3% to the trademark and the remaining 20% to other factors. This was correctly characterized as a recovery based on MMG's profits, rather than actual damages in the amount of lost royalties. As such, the district court had discretion under § 1117 to adjust this portion of the jury's award.

Go's expert provided no explanation for how he assigned the 3% figure as a reasonable royalty for use of the trademark; in fact, the district court thought it seemed to be "arbitrarily pulled out of the air." First JMOL Order, slip op. at 16. The court also pointed to the abundance of evidence in the record that the success of MMG's catheters was more likely due to its marketing and advertising efforts, the superiority of the product, its eligibility for Medicare reimbursement, and other factors, not to the "O'Neil" name. Id. We find no abuse of discretion in the court's reduction of this award.

As to the jury's award of profits, § 1117 gives district courts broad latitude to adjust this amount.[4] The district court pointed to numerous equitable considerations (which we do not repeat here) weighing against an award of profits. Id., slip op. 17-23. Likewise, the district court gave sufficient reasons why the jury's punitive damages award was properly set aside. Id., slip op at 25-43. In short, we find no abuse of discretion here.

---

[4] Go's argument that the district court erred in treating the jury's verdict as advisory lacks merit. Section 1117 expressly empowers the district court to adjust the jury's award if "the amount of the recovery based on profits is either inadequate or excessive."

**D.   Permanent Injunction**

On cross-appeal, MMG and Rüsch challenge the district court's grant of a permanent injunction, although Rüsch voluntarily dropped the "O'Neil" designation and has been calling its products "MMG/Rüsch" catheters since 2003.  As such, the permanent injunction, it seems, may have no impact on its operations.

To the extent that we need to reach the merits, however, we find that substantial evidence supports the jury's findings (1) that "O'Neil" had acquired secondary meaning; (2) that the agreement between Go and MMG included an implied trademark license; and (3) that the "O'Neil" mark was never abandoned by Go.  Thus, permanent injunctive relief was an appropriate remedy.

\*       \*       \*

We have considered the remaining arguments made by each party on the appeal and cross-appeals and find them to be unpersuasive.

### III.   CONCLUSION

For the aforementioned reasons, we affirm-in-part, vacate-in-part, and remand for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.