[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2006
THOMAS K. KAHN
CLERK

————————————————

No. 04-14228

————————————————

D. C. Docket No. 02-60703-CV-WPD

NEBULA GLASS INTERNATIONAL, INC.,
a Florida corporation
d.b.a. Glasslam N.G.I., Inc.,

Plaintiff-Appellee,

versus

REICHHOLD, INC.,
a foreign corporation,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

**(June 30, 2006)**

Before BIRCH and MARCUS, Circuit Judges, and NANGLE[*], District Judge.

_____

[*] Honorable John F. Nangle, United States District Judge for the Eastern District of
Missouri, sitting by designation.

MARCUS, Circuit Judge:

In this contract action, Reichhold, Inc. appeals from the entry of final judgment in the amount of $22.5 million in favor of the plaintiff, Nebula Glass International, Inc. d.b.a. Glasslam N.G.I., Inc. ("Glasslam"). A jury found that Reichhold supplied Glasslam with a defective product (resin), which constituted a breach of contract, breach of express warranty, and breach of implied warranty. On appeal, Reichhold argues that the district court erred in denying its Rule 50 motion for judgment as a matter of law on Glasslam's claims for certain future glass replacement damages and for lost profit damages. After thorough review, we are satisfied that a sufficient evidential foundation supports the jury's substantial award, and, therefore, affirm.

I. Facts

A. Background

The essential facts are these: the appellant, Reichhold, is a chemical company that manufactures, among other products, resin for use in making laminated glass. Appellee Glasslam supplies glass laminating resin and licenses a patented process for making an impact-resistant laminated glass product called Safety Plus 1. Safety Plus 1 is manufactured essentially by sandwiching resin and a thin film between two pieces of glass. The edges of the film are anchored to the

2

window frame. This configuration allows the glass to withstand high-velocity impact from flying objects, such as may occur during a hurricane. However, ultraviolet (UV) light causes the film and resin to degrade. To prevent this degradation a UV absorbing compound must be added to the resin.

Beginning in 1996, Glasslam contracted with Reichhold to manufacture resins containing a certain amount (.2 percent) of Tinuvin 328, a UV absorbing compound. Contrary to the agreement between the two parties, however, Reichhold included only one-half of the required Tinuvin 328 in the resin, and later replaced Tinuvin 328 altogether, using instead another UV absorber, Uvinul, which blocks less UV light than Tinuvin 328. Glasslam used some of the defective resin and sold some to its customers, who used it to manufacture Glasslam's patented Safety Plus 1 laminated glass. Reichhold supplied Glasslam with defective resin for five years.

In early 2000, Custom Glass, one of the customers Glasslam supplied with Reichhold's resin, complained that the resin was discoloring and the glass was delaminating. Then, in the summer of 2001, Norman Foxworth of Dependable Glass, another customer, reported that the Reichhold resin supplied by Glasslam did not appear to be blocking UV light properly. When Glasslam asked Reichhold whether it was using .2 percent Tinuvin 328 to manufacture the resin, Reichhold

3

falsely replied in the affirmative. Eventually, Glasslam discovered that Reichhold was not manufacturing the glass according to the detailed specifications they had agreed upon.

Not surprisingly, Glasslam filed suit on April 5, 2002, in Broward County Circuit Court, seeking damages for the defective resin it purchased from Reichhold. Glasslam's Amended Complaint asserted five claims: breach of contract (Count I); breach of express warranty (Count II); breach of implied warranty (Count III); breach of implied warranty of fitness for a particular purpose (Count IV); and fraud (Count V). Based on diversity of citizenship (28 U.S.C. § 1332), Reichhold removed the cause to the United States District Court for the Southern District of Florida, on May 22, 2002. On December 3, 2002, the district court dismissed with prejudice Counts IV (breach of warranty of fitness for a particular purpose) and V (fraud). The remaining claims were tried to a jury.

Among others, Glasslam presented expert testimony from Dr. George Frederick Willard, Jr., an organic chemist the plaintiff retained to analyze the Reichhold resin. Based on his review and analysis, Dr. Willard testified that the resin Reichhold supplied to Glasslam "is basically bad resin" that suffered from two fundamental defects: first, it was "undercooked," meaning "the chemical reaction in the reactor ha[dn't] been . . . cooked to completion"; and, second, it

4

contained either too little Tinuvin or a different UV absorber altogether. He testified that glass constructed with the defective resin will fail in the following ways: the resin will yellow; the edges of glass panes will deteriorate; the glass will become less resistant to impact from wind-blown projectiles; and the two pieces of glass will separate (delaminate) when the resin, which binds the glass together, begins to break down.

Dr. Willard also testified on direct examination as to the time frame within which all of the defective resin would fail:

Q:    In your opinion, because of the photochemical reactions [caused by Reichhold's non-conforming UV-absorbing additive] and because of the fact that the resin was undercooked . . . how long will it take this resin to fail, to become degraded, destroyed or discolored?

A:    Well, if you are talking about a clear glass and you are talking about maybe a beachfront property in the Bahamas, I would estimate about a year. . . .   If you are talking about a colored glass like a brown or a gray, and it was on a north facing building somewhere not on the beach, maybe under a canopy, it could go much longer, maybe five years before you would notice it.
The problem is you can -- you have to define what a "failure" is.  What is a "failure"?  To some people the appearance of a yellow color is a failure because you can see it.
. . . .
My concern is, though, long before you maybe see some real manifestation of the problem like the yellowness and the deterioration, that resin is in there changing.  It's changing every day.  It's trying to separate.  If you can imagine, these

5

> small molecules are migrating, believe it or not, through that matrix of higher molecular weight materials. They are collecting at the glass surface and at the PET surface, the film surface. So I can't guarantee you how long that impact performance is going to last.
> . . . .
>
> Q: What do you think is the parameters -- because there are so many different things like dryness and latitude and sun and whether its shaded -- what do you think the -- you said one year. What do you think the outside parameter is?
>
> A: About five years.

The jury returned a verdict in Glasslam's favor on all claims, and awarded Glasslam the following damages:

Out-of-pocket damages     $1,271,379.00

Unpaid customer claims  $14,665,621.00

Lost Profits                            $6,563,000.00

TOTAL DAMAGES      $22,500,000.00

On appeal, Reichhold does not challenge the jury's finding of liability, but instead asserts that some of the damages -- $12.3 million of the unpaid customer claims damages attributable to replacement costs for glass installed in Pensacola Christian College and all lost profit damages -- were speculative and therefore unrecoverable.

B.  Costs for Replacing Pensacola Christian College's Glass

6

Before trial, Reichhold moved for partial summary judgment as to Glasslam's claims for future glass-replacement damages. Because Glasslam's initial disclosures made pursuant to Fed. R. Civ. P. 26 and its answers to interrogatories identified only nine customers that had actually experienced resin-related glass problems, Reichhold argued that any damages derived from future claims made by any other customers would be speculative and, therefore, not compensable. The district court partially granted Reichhold's motion as to speculative damages, which it defined as any future replacement claims unrelated to any of the specific customer complaints Glasslam identified in its answers. Notably, in its answers, Glasslam identified "Norman Foxworth, Dependable Glass Works, Covington, LA 70434" as a complaining customer, and explained that "Dependable Glass Works experienced problems with resin sold by Glasslam and manufactured by Reichhold." Glasslam's answer also explained that "there are unknown damages at a college in Pensacola in which $5.9 million was spent on laminated glass and installation."

At trial, Glasslam called Foxworth of Dependable Glass, who testified that he installed Safety Plus 1 glass in two Pensacola Christian College buildings. He explained that the glass had already begun to fail: "It had been installed about four or five months and we had a -- small amount of pieces -- three or four -- maybe ten

7

-- I am not sure of the number of the pieces of glass we needed to replace. And we provided the glass and replaced them." Foxworth also said that, six months later, Pensacola Christian College "call[ed] and said . . . they had some more glass that was going bad." Then, two weeks before the trial, Foxworth received yet another complaint from the college regarding defects in "nine [additional] pieces of glass in Furman Dining Hall . . . scattered all over the building . . . like a checkerboard." According to Foxworth, the glass exhibited "deterioration of the resin and the interlayer." Reichhold's own glass expert also testified that he observed some delamination when he inspected glass installed in the college's auditorium.

Foxworth testified that the replacement cost would be $300,000 for defective glass in the college's dining hall and $12 million for defective glass in the auditorium. Although Foxworth had not yet made a claim for replacement of the Pensacola Christian College glass, he testified that making a claim appeared inevitable:

> Q: Have you made a claim -- well, you don't like the word "claim"--have you talked with Steve Howes [Glasslam's owner] about Furman Dining Hall?
>
> A: I have not.
> . . . .
> Q: Have you made a claim on Glasslam for that $12 million for replacement?

8

A: As of this moment I have not, but I have counseling that we have to -- we are reviewing. From the information that I am receiving in the last three to four weeks, it appears I have no choice unless Glasslam can assure me how I am going to get the money to replace the glass.

Q: The $12,000,000?

A: Yes, sir. The $300,000 plus the $12,000,000.

At the close of Glasslam's case, Reichhold moved for judgment as a matter of law pursuant to Rule 50, urging that the jury should not be allowed to award any damages for replacement of the Pensacola Christian College glass. Reichhold explained that the district court had already granted partial summary judgment barring recovery "as to potential claims for exposure for faulty glass," and argued that this ruling necessarily barred Glasslam from recovering for any damages other than the "specific complaints" alleged in Plaintiff's Answers to Interrogatories. The district court said that the issue could be addressed through jury instructions and that Reichhold could move to correct any judgment that was not supported by the evidence. At the close of all evidence, the court denied Reichhold's renewed Rule 50 motion.

During the charging conference, Reichhold again raised its concern about Glasslam's claim for damages related to replacement of the college's glass:

THE COURT: Didn't I rule on that? Didn't I say that speculative claims that haven't even been made are out of the lawsuit? But I don't think I excluded legitimate claims that were made that just haven't been paid yet by Glasslam.

MR. LOTTERHOS [Reichhold's Attorney]: But, your honor, the claims are not legitimate and Glasslam has no obligation to pay them unless there has been a judgment against Glasslam. For instance, if you were to hand them $12,000,000 for Pensacola Christian College, the college--right now that there is only nine panes of glass that are delaminated in that college. Suppose none of them ever delaminate . . . .

THE COURT: And I think you should be able to argue that to the jury that they shouldn't give any money for Pensacola College. But if the jury sees otherwise, if the jury sees that this claim is a legitimate claim and it's just a question of time before Glasslam is going to have to pay it, then it seems to me that non-speculative future damages are legitimate.

Ultimately, the district court gave the following jury instruction, proposed by Glasslam, and over Reichhold's objection: "Glasslam may only seek to recover damages for those specific claims which have been presented to you during this trial. You should not consider at this time any damages for future claims which have not been specifically presented in this trial." After deliberation, the jury awarded Glasslam damages for the college's glass.

In post-trial motions, Reichhold again asserted that damages for replacement of the college's glass were impermissibly speculative and precluded

10

by the district court's partial summary judgment. Again, the district court denied these motions.

## C. Lost Profit Damages

At trial, Glasslam also presented evidence in support of its claim that Reichhold's defective resin caused Glasslam to lose profits. Glasslam's owner, Steve Howes, testified that Glasslam's reputation was significantly and discernibly damaged because of the many problems associated with Reichhold's non-conforming resin. He explained that his main product, the Safety-Plus 1 window system, was taken out of production because of Reichhold's resin and the buildings with the defective glass were offered by his competitors as a rationale for rejecting Glasslam's product:

> Q: Has it effected your business?
>
> A: It's effected our reputation something terrible.
> . . . .
> [M]ost of the fabricators of the Safety Plus product have ceased
> manufacturing it because of all the failures they have had. And there
> are many, many buildings throughout the state of Florida that have
> the product in them that my competitor salesmen use as exhibits
> against me.
>
> Jackson Memorial Hospital has become a very, very famous building
> in the glass industry. And Glasslam's reputation in the hurricane
> business is bad. It's hard to explain just how bad.

11

Howes further explained that Glasslam experienced a rapid rate of revenue growth in the years after the patented Safety Plus 1 window system hit the market, but, notably, after word spread of the problems caused by Reichhold's defective resin, the sales of Safety Plus 1 dropped to "almost zero," and Glasslam "lost most of . . . [its] customers."

Glasslam also introduced the testimony of two different glass fabricators -- Roger Warwick and Victor Prieto -- who stopped purchasing Glasslam glass after experiencing problems associated with delamination and discoloration. Both testified that their companies began purchasing Glasslam glass in 1996, but stopped doing so in 2001, after the glass it had installed began to delaminate or discolor.

Finally, Glasslam offered the testimony of Ronald Patella, an accounting and business valuation expert who opined that the company's lost profits attributable to decreased Safety Plus 1 revenue, past and future, amounted to $7,621,000.

At the close of the presentation of all of the evidence, Reichhold moved for judgment as a matter of law under Rule 50 on Glasslam's lost profits claim, asserting that Glasslam failed to prove causation or the amount of lost profits with reasonable certainty. Reichhold argued that Glasslam's expert improperly

calculated lost profit damages by including in his calculations customers who stopped doing business with Glasslam for reasons unrelated to the non-conforming resin, customers who continued to purchase from Glasslam despite having resin problems, and customers who never experienced a problem with the resin. Again, the district court denied this motion as well as Reichhold's renewed post-trial Rule 50 motion on the claim for lost profits.

## II. Glass Replacement Damages

Reichhold claims the district court erred by denying its Rule 50 motion for judgment as a matter of law as to damages for Glasslam's lost profit and replacement of the college's glass. Fed. R. Civ. P. 50 provides a vehicle for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the case:

> (a)(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50(a) (emphasis added). "We review a Rule 50 motion de novo and apply the same standard as the district court." Telecom Technical Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004). "In doing so, we draw all

13

inferences in favor of the non-moving party," and "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." Id. "Although we look at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1312 (11th Cir. 2006) (internal quotation marks omitted) (quoting Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000)). Elsewhere, we have explained that "[t]he court should deny [a motion for judgment as a matter of law] if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005); Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 659 (11th Cir.1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.").

Reichhold's appeal of the $12.3 million in damages awarded for future replacement of the college's glass offers two errors made by the district court: first, the court improvidently reversed its own partial summary judgment order and prejudiced Reichhold when, late in the trial, it allowed Glasslam to seek damages

14

for replacement of the Pensacola Christian College glass; and, second, Reichhold says the replacement damages sought for the college's glass were speculative and, therefore, improper as a matter of law. We are unpersuaded.

Reichhold's first argument fails because the district court's trial ruling reasonably construed its own summary judgment order as having allowed recovery of damages for future replacement of the Pensacola Christian College's glass, and this determination was well within the district court's discretion.

The relevant portion of the district court's April 27, 2004 order granting partial summary judgment as to speculative damages claims provided:

> Although the Court does not treat the possibility of safety risks lightly, Glasslam has failed to come forward with affirmative evidence supporting any potential damages claims. Other than the specific complaints identified in Glasslam's Answers to Interrogatories (provided by Reichhold), Glasslam has not provided any evidence of other claims it will have to address in the future.
> . . . .
> Accordingly, the Court finds that Glasslam's claims for potential exposure for faulty glass could only be deemed conjectural or hypothetical at best. Glasslam has not set forth any evidence demonstrating any type of actual or imminent injury with respect to potential claims. . . . Accordingly, Reichhold's Motion for Summary Judgment on this issue is granted as to potential claims for exposure for faulty glass.

(emphasis added).

The order distinguishes between speculative claims -- those based on replacement of glass for which Glasslam received no complaints and produced no

15

evidence indicating that the glass would have to be replaced -- and permissible, non-speculative claims -- those based on replacement of glass for which Glasslam had received specific complaints and identified those complaints in its interrogatory answers. It seems evident to us that the district court's partial summary judgment order barred the former but not the latter.

Glasslam's claim for replacement of the college's glass falls into the latter category of claims not barred by the partial summary judgment order. Glasslam's interrogatory answers identified a specific complaint received from "Norman Foxworth, Dependable Glass Works, Covington, LA 70434," and explained that "Dependable Glass Works experienced problems with resin sold by Glasslam and manufactured by Reichhold." Glasslam's interrogatory answers also specifically identified "unknown damages at a college in Pensacola in which $5.9 million was spent on laminated glass and installation." These references to problems encountered at Pensacola Christian College are specific enough to bring the claim within the ambit of non-speculative future replacement claims as defined by the district court.

When Reichhold raised the same argument before the district court, the court construed its partial summary judgment order in the same way:

THE COURT: Didn't I rule on that? Didn't I say that speculative claims that haven't even been made are out of the lawsuit? But I don't

16

> think I excluded legitimate claims that were made that just haven't been paid yet by Glasslam.
> . . . .
> [I]t's just a question of time before Glasslam is going to have to pay it, then it seems to me that non-speculative future damages are legitimate.

(emphasis added). When a district court interprets its own order, we are obliged to review that interpretation for abuse of discretion and accord its interpretation deference so long as it is reasonable. Cave v. Singletary, 84 F.3d 1350, 1354-55 (11th Cir. 1996); Commercial Union Ins. Co. v. Sepco Corp., 918 F.2d 920, 924 (11th Cir.1990). See also In re Chicago, Rock Island and Pac. R.R. Co., 865 F.2d 807, 810-11 (7th Cir. 1988) ("The district court is in the best position to interpret its own orders."). Here, Reichhold has shown, at most, only that the summary judgment order may have been ambiguous. But identifying a potential ambiguity does not render the district court's construction of its own order unreasonable. Indeed, the district court's interpretation was altogether reasonable. There was no abuse of discretion in allowing Glasslam to present the claim for replacement of the college's glass to the jury.

Reichhold also argues that the replacement damages for the college's glass were speculative because the evidence was insufficient to establish that Glasslam would ever have to replace the college's windows, and if no replacement is ever required, this damage award would amount to a windfall recovery for Glasslam.

17

We disagree.  The record evidence presented at trial, when construed in a light most favorable to Glasslam, was sufficient to enable the jury to find it was reasonably certain Glasslam would have to replace the glass at the college.

We are Erie-bound by Florida law in deciding this diversity case, Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), and the Florida Supreme Court's recent decision in Auto-Owners Ins. Co. v. Tompkins, 651 So. 2d 89 (Fla. 1995), is a useful starting point. There, the plaintiff was injured in a motor-vehicle accident. Id. at 90.  Liability was admitted, so only the question of damages went to the jury. The Florida Supreme Court explained that future economic damages were recoverable if they were established with reasonable certainty.  Id. at 90-91. "Under the certainty rule, which applies in both contract and tort actions, recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty." Miller v. Allstate Ins. Co., 573 So. 2d 24, 27-28 (Fla. 3d DCA 1990) (emphasis added) (citing Restatement (Second) of Contracts § 352 (1981); Restatement (Second) of Torts § 912 (1982); McCall v. Sherbill, 68 So. 2d 362 (Fla. 1953); accord Richard A. Lord, Williston on Contracts § 64:8 ("The amount of damages must be established with reasonable, not absolute, certainty. . . . It is sufficient if a reasonable basis for

18

computation of damages is afforded, even though the result will only be approximate." (footnotes omitted)).

Reichhold argues nonetheless that two contingencies make the replacement damages for the Pensacola Christian College's glass wholly speculative: (1) the college's glass had not yet failed, and may never do so; and (2) Dependable Glass, the contractor that manufactured and installed the college's glass with the defective resin Glasslam supplied, had not yet made, and may never make a replacement claim. We disagree, because Glasslam presented sufficient evidence at trial that, if construed in a light most favorable to Glasslam, established with reasonable certainty both that the College's glass will fail and that Dependable Glass will seek replacement costs.

As we have already noted, Glasslam introduced the testimony of Dr. Willard, an organic chemist, who explained that the resin Reichhold supplied to Glasslam was defective because it was "undercooked," meaning "the chemical reaction in the reactor ha[dn't] been . . . cooked to completion," and that it contained either too little Tinuvin or a different UV absorber altogether. Willard also testified that all of the glass containing the defective resin -- which includes the College's glass -- would fail one to five years after installation. Moreover, Norman Foxworth of Dependable Glass explained that the college's glass began to

19

fail less than one year after it was installed, and that it failed on at least three separate occasions. Finally, Reichhold's own glass expert testified that he observed delaminating glass when he inspected the college.

Although it is a close question, after thorough review we are satisfied the evidence was sufficient to allow the jury to find that the college's glass was reasonably certain to fail within five years of installation. And, once the jury reached this conclusion, there was sufficient additional evidence from which the jury could also find that Pensacola Christian College and/or Dependable Glass were reasonably certain to seek replacement costs from Glasslam. Indeed, Foxworth's testimony left little doubt on this point when he explained that "it appears I have no choice [but to file a claim for replacement of the college's glass] unless Glasslam can assure me how I am going to get the money to replace the glass." Foxworth further testified that the college had already required him to replace pieces of faulty glass on three separate occasions. Moreover, common sense alone strongly suggests (and the jury could find) that Dependable Glass would seek compensation for $12.3 million in replacement costs. Reichhold points to no evidence undermining this inference. Under Florida law, future damages need only be reasonably certain, not absolutely certain. See Tomkins, 651 So. 2d at 91; Miller, 573 So. 2d at 27-28. The possibility that the college and

20

Dependable Glass would fail to seek recovery from Glasslam for replacement of the defective glass is, indeed, remote. At all events, there was sufficient evidence that Glasslam was reasonably certain to incur damages for replacing the college's glass. The district court properly denied Reichhold's motion for judgment as a matter of law.

## III. Lost Profit Damages

Reichhold also argues that the district court erred in denying its Rule 50 motion on Glasslam's claim for lost profit damages. Reichhold says it is entitled to judgment as a matter of law for two independent reasons: (1) Glasslam failed to prove causation with reasonable certainty; and (2) Glasslam failed to provide an adequate standard for determining the amount of lost profit damages. Again, we remain unpersuaded.

It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty. See, e.g., W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1350-51 (Fla. 1989); Twyman v. Roell, 166 So. 215, 218 (Fla. 1936). And since proving lost profits invariably includes some element of prediction about how the market would have behaved but for the defendant's tortious act or breach, Florida courts have often noted that proving lost profits damages is difficult, but by no

means impossible.  See, e.g.,  W.W. Gay, 545 So. 2d at 1350-51; Twyman, 166 So.

at 217-18; Aldon Indus., Inc. v. Don Myers & Assocs., Inc., 517 F.2d 188, 191

(5th Cir. 1975).

In W.W. Gay, the Florida Supreme Court explained the standard for proving

lost profits this way:

> The two seminal Florida cases on recovery of prospective profits are
> Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936), and New
> Amsterdam Casualty Co. v. Utility Battery Manufacturing Co., 122
> Fla. 718, 166 So. 856 (1935). In New Amsterdam this Court held that
> prospective business profits are generally too speculative and
> dependent on changing circumstances to be recovered. New
> Amsterdam provided an exception allowing the plaintiff to show the
> amount of his loss by competent proof. However, this exception only
> applied to the interruption of an established business. Twyman, on the
> other hand, did not limit recovery to established businesses. There,
> the Court stated that, if there is a "yardstick" by which prospective
> profits can be measured, they will be allowed if proven. 123 Fla. at 6,
> 166 So. at 217. The Court provided further that the "uncertainty
> which defeats recovery in such cases" is the cause of the damage
> rather than the amount. "If from proximate estimates of witnesses a
> satisfactory conclusion can be reached, it is sufficient if there is such
> certainty as satisfies the mind of a prudent and impartial person." Id.
> at 7-8, 166 So. at 218.

> We follow the holding in Twyman. A business can recover lost
> prospective profits regardless of whether it is established or has any
> "track record." The party must prove that 1) the defendant's action
> caused the damage and 2) there is some standard by which the amount
> of damages may be adequately determined.

545 So. 2d at 1350-51 (emphasis added); see also Sostchin v. Doll Enters., Inc., 847 So. 2d 1123, 1127-28 (Fla. 3d DCA 2003); HGI Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867, 878-79 (11th Cir. 2005).

Reichhold says Glasslam failed to prove causation. Reichhold cites to Aldon Industries, Inc. v. Don Myers & Associates, Inc., 517 F.2d 188, 193 (5th Cir. 1975), for the proposition that a dealer may not recover lost profits caused by manufacturer's defective product unless the dealer has become so identified with the defective product that in the eyes of third parties it and not the manufacturer is held responsible for the defects. According to Reichhold, Glasslam failed to prove that it had become so identified with Reichhold's resin that Glasslam (not Reichhold) was perceived as being responsible for the defect. Glasslam, however, introduced sufficient testimony to show that third parties held Glasslam responsible for Safety Plus 1's failure. Howes testified that the defective resin badly damaged Glasslam's reputation, that most fabricators of the product had stopped making it, and that his competitors used the resin's defects against him. Howes also said that Glasslam experienced an extraordinarily sharp drop in its sales of the product after the problems concerning the defective resin became evident. This evidence, if credited, was sufficient to clear Aldon's hurdle.

23

Reichhold nevertheless argues that Glasslam did not offer enough evidence that the defective resin actually caused Glasslam to lose profits, but instead merely assumed causation. Reichhold points to evidence that some customers stopped buying from Glasslam for reasons unrelated to the problems associated with Reichhold's defective resin, and that most of the customers never reported experiencing any problem with the resin. Glasslam counters that evidence of each individual customer's motivation is not required because Glasslam's evidence, taken as a whole, sufficiently proved causation. We agree.

The Florida Supreme Court's decision in W.W. Gay, 545 So. 2d at 1349, is instructive on this point. There, investors formed a company, Wharfside Two, to build and operate a hotel, and hired W.W. Gay to construct the hotel's water system. Before and after the hotel opened, observers noticed a petroleum-like odor in the hotel's water system that Gay was unable to correct. Wharfside sought lost profit damages from Gay, arguing that Gay caused the odor problems that, in turn, reduced the number of guests at the hotel. The trial court refused to allow expert testimony concerning lost profits as being too speculative. Id. On appeal, the Florida Supreme Court reversed, holding:

> We reject the contention that the causal connection between foul-smelling water and lost revenues was too tenuous. There was competent and substantial evidence that the odor was a cause of reduced occupancy. This evidence was supported by studies prepared

24

by reputable economic analysts and provided a sufficient standard to support the experts' testimony concerning lost profits. The expert testimony, when combined with the economic studies, was clearly sufficient to raise a jury question. Accordingly, the trial court erred by excluding testimony on lost profits.

Id. at 1351. In dissent, Judge McDonald raised virtually the same argument Reichhold asserts here, but failed to convince the majority of the court:

In my view Wharfside utterly failed to prove any connection between foul-smelling water and reduced occupancy rates. I do agree that two managers opined that this was a cause of lost revenues, but there was no factual foundation for their opinions. The proof falls far short of satisfying the mind of a prudent and impartial person that the odor was a cause of an occupancy rate less than that which had been projected. No one testified that prospective guests declined to come to or to return to the hotel because of the odor from the water.

Id. (emphasis added).

We are guided by W.W. Gay in concluding that lost profit damages may be proven in these circumstances without testimony regarding each customer's purchasing decisions. The lost profit damages in this case were not speculative simply because Glassslam did not present evidence of every customer's reason for not buying Safety Plus 1 glass. Under W.W. Gay, so particularized a form of proof is not required. Id. at 1351. The combination of direct and circumstantial evidence presented at trial was sufficient to establish causation with reasonable certainty. Howes testified that the defects in Safety Plus 1 glass became widely known, to the detriment of Glasslam's reputation. He testified unambiguously that as word spread

25

in the glass industry that Safety Plus 1 windows contained defective resin, his sales declined to "almost zero." Howes explained that prominent examples of the product's failures, like the glass installed in Jackson Memorial Hospital, were used by competitors to sell their products instead of his. He added that "most of the fabricators of the Safety Plus product have ceased manufacturing it because of all the failures they had." Glasslam also introduced the testimony of two individual glass fabricators -- Roger Warwick and Victor Prieto -- who stopped purchasing Safety Plus 1 product after glass they installed began to delaminate and discolor.

In addition to the direct evidence on causation, Glasslam introduced circumstantial evidence too. From its inception in 1998 through 2000, Safety Plus 1 revenue grew at an annual rate of 27.5 percent per year, but beginning in 2001 -- at precisely the same time Warwick and Prieto stopped buying Safety Plus 1 because of glass failure -- Glasslam's sales of Safety Plus 1 decreased. All of the evidence, taken in the light most favorable to Glasslam, allowed the jury to find with reasonable certainty that Reichhold's defective resin caused Glasslam's Safety Plus 1 revenue and profits to decline.

The cases Reichhold cites do not advance its argument. Reichhold's reliance upon Brough v. Imperial Sterling Ltd., 297 F.3d 1172 (11th Cir. 2002) is misplaced. There, Brough sued Imperial Sterling Ltd (ISL) for breach of a contract

26

to pay commission for sale of real estate. The jury awarded future profit damages to Brough based on evidence that certain properties would be sold after trial but before Brough's contract would have expired. On appeal, a panel of this Court held that "the jury's award of $2,585,000 for 'future commissions on other Florida properties' was based on speculation that ISL would sell its property," and was, therefore, impermissible because "it was unclear at the time of the trial whether ISL would have sold its Florida property before November 1, 2002, when Brough's contract expired." Id. at 1177.

Brough differs substantially from the instant case in important ways. Brough's entire case depended on proving how a single company would behave in the future based on that company's actions in the past. Glasslam's case included testimony about a large group of consumers' actual purchasing decisions for three years, and extrapolating that trend forward. A far larger sample size means Glasslam's projection, unlike the plaintiff's in Brough, is not susceptible to the randomness of an individual company's whim. Glasslam's case is more like W.W. Gay than Brough.[1]

---

[1] Similarly distinguishable is Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc., 459 So. 2d 335, 337 (Fla. 5th DCA 1984). There, the court held that plaintiff's "claim for lost profits . . . is . . . too remote. McClung sought to recover for loss of future business with Cardinal, not business that it actually had with the developer. McClung had no future contract binding Cardinal to buy further shipments of sod. No future price was established or agreed upon." Id. Glasslam's lost profit claim did not depend on any obligation by

27

Moreover, Glasslam's case for future profits rests on the inferences that one may reasonably draw from direct evidence that some customers refrained from buying Safety Plus 1 after the defects became known, coupled with the demonstrable fact that its profits were trending sharply upward for the three years before the resin problems surfaced, and plunged sharply at precisely the time when the defects became known in the relevant community. And as Glasslam's expert made clear at trial, his projections of lost profits assumed an upward trend in revenues without differentiating between sales to existing and new customers. Neither the past profits nor projected future profits was premised on the speculation that "none of Plaintiff's customers would have changed their business practices," nor that "all these customers would refuse to do business with Plaintiff in the future." Reichhold's argument--that the jury could only award damages for future lost profits if they speculated that the exact same customers would continue buying the exact same amount of product--is simply wrong.[2]

its customers, but rather on the common-sense notion that a large group of sophisticated commercial purchasers would not, without cause, collectively reject a product they had been using. Nor does Glasslam's claim depend, as McClung's did, on predicting the behavior of a single customer.

[2] The other cases Reichhold relies on are also inapposite. Reichhold cites to Dictiomatic, Inc. v. U.S. Fidelity & Guaranty. Co., 958 F. Supp. 594, 604 (S.D. Fla. 1997), for the proposition that a proper analysis of lost profits cannot rest on too many variables. There, the court rejected Dictiomatic's claim for lost profits because evidence showed Dictiomatic experienced "income losses throughout its entire period of operation immediately prior to the hurricane, and further that there is inadequate proof that Dictiomatic would have achieved profitability during the

Finally, Reichhold argues that the amount of lost profit damages was not adequately proven. In lost profit cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick

_____

period of business interruption or immediately thereafter." Id. Here, in contrast, the evidence showed substantial profits in the three years leading up to Reichhold's breach. Projecting future profits based on the continuation of a substantial existing trend is far different from projecting profits that contradict an existing trend.

Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1105-06 (11th Cir. 1983), is likewise unavailing. There, the plaintiff, a copy machine dealer, sued the manufacturer alleging breach of contract and warranty based on the machines' failure to perform in accordance with the manufacturer's performance assumptions regarding the potential profitability and tax advantages of a hypothetical dealer. The plaintiff's proof of damages consisted of a "Special Analysis" that compared the plaintiff's actual earnings with an estimate of what it would have earned had it leased all of its copiers and otherwise operated its business on the basis of the manufacturer's performance assumptions. A panel of this Court held that there was no evidence that the plaintiff ever operated its business in accordance with the [performance assumptions]." Id. We concluded that "the hypothetical firm in this study was not sufficiently comparable to plaintiff's business operation . . . . " Id. Unlike the facts presented in this case, the plaintiff in Royal Typewriter had no track record of profitability on which to base projected profits, but attempted to model the business's profits based entirely on a hypothesis. Here, in sharp contrast, Glasslam used three years of actual profit figures to project future profits.

In Sostchin v. Doll Enters., Inc., 847 So. 2d 1123, 1127 (Fla. 3d DCA 2003), the court rejected as speculative the plaintiff's future lost profit damages. The court found, in particular, that the plaintiff's expert used gross profits without deducting costs, and used a single year's profit figures to extrapolate forward six and one half years. "Using this small slice of time to define the trend for the entire six and a half year remainder of the lease term, the expert projected that, but for the fire, the profitability of the business would have continued to escalate dramatically." Id.

Last, in Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc., 832 So. 2d 147, 153 (Fla. 5th DCA 2002), the court rejected a jury's verdict awarding lost profits because "the evidence showed that the [plaintiff] had not earned profits for a reasonable time before the dispute, and as such, lost profits were not established by a reasonable degree of certainty." This, of course, differs markedly from the instant case where profits in the years leading up to the breach were well documented.

29

by which to estimate the damages. As the Florida Supreme Court in W.W. Gay explained, "the 'uncertainty which defeats recovery in such cases' is the cause of the damage rather than the amount. 'If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person.'" 545 So. 2d at 1350-51(quoting Twyman, 166 So. at 218).  Thus, lost profit damages are recoverable if there is "some standard by which the amount of damages may be adequately determined." W.W. Gay, 545 So. 2d at 1350-51; accord Sostchin v. Doll Enters., Inc., 847 So. 2d 1123, 1128 (Fla. 3d DCA 2003);  HGI Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867, 877-80 (11th Cir. 2005).

Glasslam's accounting and valuation expert, Ronald Patella, testified that the company's total lost profits, past and future, were $7,621,000.  He explained his methodology this way:

> Glasslam . . . ha[s] many product lines.  There is only one product line that we are concerned with here . . . Safety Plus 1. . . .  So what I had to do was look at the financial statements and the revenues prior to the damages, which would be 1998 through 2000, look at the level of revenues, their growth rate, and from that I projected into the future how much estimated revenues would be.

In quantifying the amount of revenue Safety Plus 1 would have produced but for the defective resin, Patella projected continued growth in revenue by extrapolating

30

forward the company's established historical growth rate for the same product. Patella projected the lost profits from 2001 through 2006, but did not project any future lost profits beyond 2006 because he assumed that "by the end of 2006 . . . [Glasslam] would be in the same position with Safety Plus 2 as they would have been with Safety Plus 1.  So that's when the damages stopped.  They were not out-of-pocket anything any more."

From 1998 to 2000, the average yearly rate of revenue growth from the Safety Plus 1 product was 27.5%.  Again, based on that historical rate of growth, and an expanding market caused by the widespread enactment of building codes in Florida and elsewhere requiring impact-resistant glass, Patella projected that Safety Plus 1 revenue would have increased 30.0% in 2001, 35.0% in 2002, 40.0% in 2003, 25.0% in 2004, 20.0% in 2005 and 15.0% in 2006.  The projected average rate of revenue growth over the six year period was 27.5%, which equals the rate of growth Safety Plus 1 actually experienced before Reichhold's breach.

Thus Patella projected Glasslam's Safety Plus 1 revenue would have increased at a rate of 27.5%, while assuming a correlative increase in variable production costs.  By calculating total projected Safety Plus 1 revenue, less total projected production costs (fixed and variable), Patella arrived at a gross lost profit figure.  For the years from 2003 to 2006 Mr. Patella also deducted from the gross

31

lost profit figure the amount of net income Glasslam earned on the Safety Plus 2 product, which Glasslam developed to mitigate its damages and replace Safety Plus 1. That deduction reduced Glasslam's gross lost profits from $15.2 million to $7.6 million.

Patella performed his calculations in 2004, therefore the net lost profit figure breaks down into two categories: past lost profits and future lost profits. Patella calculated past lost profits by comparing the actual 2001- 2003 Safety Plus 1 revenue against his projections of what profits would have been during those years but for Reichhold's breach. But for the years 2004 to 2006, no actual revenue numbers were available, so Patella projected forward actual, post-breach Safety Plus 1 revenue and compared it with the projected "but for breach" revenues based on pre-breach revenue trends.

Patella's detailed calculations and methodology provided an adequate yardstick for the jury to award lost profit damages. Although Reichhold is surely correct that Patella's calculations involved estimating a number of variables that cannot be predicted with certainty, Florida law clearly does not require that the amount of lost profits be certain. Again, the law does require a reasonable standard

for calculation, and we are satisfied that Mr. Patella's testimony provided the jury with a reasonable standard.  See W.W. Gay, 545 So.  2d at 1351.[3]

Accordingly, we affirm in all respects the district court's denial of Reichhold's Rule 50 motion for judgment as a matter of law.

AFFIRMED.

---

[3] Reichhold's other objections to the damages calculations are no more compelling, and are largely a reprise of its causation arguments that the lost profit calculation: (1) included customers who never personally experienced problems with Reichhold's resin; (2) included customers who stopped doing business for reasons unrelated to Reichhold's resin; and (3) failed to attribute specific amounts of lost profits to specific customers.

Reichhold cites no authority for any of this, and we remain unpersuaded.  First, lost profits are not limited to customers who personally experienced the failure.  See W.W. Gay, 545 So. 2d at 1351(holding that expert testimony and economic studies showing loss of prospective customers were sufficient to raise a jury question as to lost profits, even in the absence of any testimony by individual customers).  Second, the lost profit calculation was based on an aggregate trend of revenue growth, not on predictions about individual customers' purchase decisions.  The method used did not assume that Glasslam would keep the same customers from 2001 to 2006, but assumed simply that Glasslam would continue to gain more business than it lost, as it had from 1996 to 2000.  Thus, Glasslam's calculations are not invalidated by evidence that some customers stopped buying Safety Plus 1 for reasons unrelated to Reichhold's resin. Third, Reichhold is simply wrong in its unsupported assertion that lost profits must be attributable to the loss of specific customers.

Finally, Reichhold argues that Glasslam "admittedly was not seeking damages for 'overseas' customers," and, therefore, it was improper for Glasslam's lost profit calculations to include sales to overseas customers.  But Reichhold cites no order or stipulation excluding damages for lost profits from overseas customers, and bases this claim on a single line of ambiguous testimony by Howes on cross examination.  Even if we were inclined to assign any merit to Reichhold's argument, we would still be unmoved because Reichhold failed to raise this argument in its Rule 50(a) or 50(b) motions.  "By well settled convention, appellate courts generally will not consider an issue or theory that was not raised in the district court." F.D.I.C. v. Verex Assurance., Inc.,  3 F.3d 391, 395 (11th Cir. 1993); see also Ford v. United States, 989 F.2d 450, 453 (11th Cir.1993).

33