MARTIN, Circuit Judge,
dissenting:
In reviewing a District Court’s denial of a motion pursuant to Rule 50 of the Federal Rules of Civil Procedure, we must “affirm the jury verdict unless there is no legal basis upon which the jury could have found for the plaintiff.” Nebula Glass Intern., Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir.2006) (alteration and quotation marks omitted). “Judgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict.” Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir.2001). This standard does not allow us to scrutinize the testimony and evidence actually presented at this trial, with an eye towards what we ourselves would have required in order to render the verdict which this jury did. Neither does it allow us to speculate about how the FDIC could have or should have tried this case in order to persuade us to their side. Instead our charge is to draw “all inferences in favor of the non-moving party,” and affirm the verdict where there is any legal basis upon which the jury could have found for the FDIC. Telecom Technical Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir.2004). With these rules in mind, and having reviewed the evidence which I summarize below, I would not overturn the verdict reached by the jury here. I therefore respectfully dissent.
Steve Putnam, executive vice president and chief lending officer at the now-defunct First Priority Bank (the Bank), drafted the credit approval request (Credit Request) at the heart of this case. The Credit Request Mr. Putnam drafted and circulated to key Bank employees described the loan’s collateral as including “assignment of the option contract to purchase” Parcel V, a 25-acre waterfront parcel critical to Phase II of the planned two-phase project. The Credit Request also included language saying that River Meadows Development, LLC (River Meadows) “has purchased or contracted to purchase” a “25-acre Land Parcel (Option Contract)” for a price to be determined. Neither of these statements was true. Beyond that, the Credit Request stated that Phase II “will consist” of Parcel V. But the purchase of the 25-acre land parcel never happened, because the project collapsed before there ever was a Phase II.
Mr. Putnam and the Bank hired Robert E. Messick and his firm, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. (collectively Icard), to represent the Bank in closing the loan. A few days before the scheduled closing on February 16, 2006, Mr. Putnam sent the Credit Request to Mr. Messick, a man Mr. Putnam had known for about 20 years. Mr. Messick knew there was no option contract on Parcel V because he had represented River Meadows in ultimately unsuccessful negotiations with the owners of the parcel to obtain it.’ Mr. Messick testified at trial that he did not know if he noticed the Credit Request inaccurately stated River Meadows, the borrower, had “purchased or contracted to purchase” Parcel V. But Mr. Messick did notice “an error” in a “summary of the collateral description.”
Icard had a reasonable duty to inform Mr. Putnam about all of the errors in the Credit Request, given that approval of the loan was based on representations in that document. See Proto v. Graham, 788 *860 So.2d 393, 395 (Fla. 5th DCA 2001). The jury received conflicting evidence about whether Mr. Messick told Mr. Putnam about all of the errors in the Credit Request. Mr. Messick testified that he told Mr. Putnam about “an error” in the “summary of the collateral description” in advance of the February 16 meeting. But Mr. Messick’s billing records, admitted as evidence, reflect no entry for any such conversation. Though the absence of an entry is not dispositive, a juror could find it persuasive because Mr. Messick’s billing records regularly noted client communications. Mr. Putnam testified at trial that he “would have to say that” Mr. Messick told him about a problem with the Credit Request’s collateral description before the meeting. But the jury could have given little weight to Mr. Putnam’s trial testimony both because his testimony was equivocal about what actually happened and also because he admitted that his trial testimony on this point “sound[ed] contradictory to what [he] said in [his] deposition.” “Credibility determinations, the weighing of the evidence, and the drawing' of legitimate inferences from the facts are jury functions, not those of a judge.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000) (quotation marks omitted). Given the record, a reasonable juror had enough evidence to infer that Mr. Messick failed to notify Mr. Putnam about errors in the Credit Request before the loan committee meeting.
Evidence at trial • suggested that Mr. Putnam did not give fully accurate information to the senior loan committee at the February 16, 2006 meeting. In advance of that meeting Mr. Putnam made, no effort to correct the fact that the Credit Request incorrectly listed the option contract on Parcel V as part of the collateral for the loan. He testified that if he had learned that River Meadows did not have an option contract before the meeting, he would have waited to explain that fact to the loan committee at the meeting. The jury saw the minutes from the February 16, 2006 meeting. Mr. Putnam testified that those minutes would' “absolutely” be different than the Credit Request because- they would indicate that he “presented] the new facts” in an “oral presentation.” In fact, the meeting minutes are in no way different from the Credit Request, and give no indication that Mr. Putnam presented any new facts. Rather, the minutes indicate that the loan was conditioned, in part, on the assignment of an option contract for Parcel V. According to the minutes, the loan was approved “as presented,” which included Parcel V as collateral. The loan committee did not amend the Credit Request in any way.
Icard was supposed to draft the loan commitment letter in keeping with the Credit Request, but it did not. The Bank’s written instructions to Icard for drafting the loan commitment letter came exclusively from the Credit Request. No individual loan committee member could change the terms of a Credit Request; that could only be done by the committee itself. Yet Mr. Messick testified at trial that he did not view the Credit Request “as absolute instructions from the bank.” It is thus no surprise that according to the trial testimony of Mark Riley, an expert on banking, Mr. Messick “did not follow the terms of the [Credit Request].”
It was reasonable for this jury to look at the evidence presented and conclude that the Bank would not have made the loan without the acts and omissions of Icard. The Credit Request indicated in several places that collateral for the loan included an option contract for Parcel V. Mr. Mes-sick knew this was false, but it is not clear that he took action when he could have to correct the problems. The minutes from *861 the February 16, 2006 meeting indicate that the loan committee believed that Parcel V was part of the collateral, and made its decision based on that fact. The loan committee never changed the description of the loan’s collateral to show that the collateral did not include the option on Parcel V, as the rules of the Bank required. And although Icard’s written instructions in preparing the loan commit- . ment letter came only from the Credit Request, the letter it prepared failed to mention Parcel V.
The majority has held that “any inference that the option contract was a key part of the loan based on the inadequacy of the other security for the loan would be unsupported by the record.” Panel Op. at 8. But based on the evidence I have just reviewed, I believe the record does support an inference that the option contract was important to the Bank’s approval of the loan. Also, as the Majority recognizes, Parcel V “was a unique piece of land that was important to the development project contemplated by River Meadows.” Panel Op. at 7. Even if the jury had to “speculate” about the Bank’s response and rely on circumstantial evidence that the Bank would not have made the loan without the option, Panel Op. at 8, this type of evidence can support a finding of causation. See Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1565 (11th Cir.1995); see also Fenner v. Gen. Motors Corp., 657 F.2d 647, 650 (5th Cir.1981)[1] (“This Court recognizes that a jury may properly reconstruct a series of events by drawing an inference upon an inference.”). Here the jury and the District Court both found sufficient evidence to support a ver-diet in favor of the FDIC. On this record, I would not disturb their judgment. See Reeves, 530 U.S. at 149, 120 S.Ct. at 2109 (noting that a Rule 50 motion should be granted only when “there is no legally sufficient evidentiary basis” to support the verdict (quoting Fed.R.Civ.P. 50(a))).
Although the jury heard from some loan committee members that they would have made the loan regardless of whether Parcel V was included as collateral, the jury had more than one reason to give minimal weight to that testimony. As the District Court noted, the jury could have had reason to find that those members were unreliable because “it is reasonable for a jury to assign a higher value and level of credibility to a written document than to contradictory and often obfuscated oral testimony. After all, the purpose of writing information down is to compensate for the tendency of memories to fade or change.” At least two written documents were in tension with the Bank witnesses’ testimony: the Credit Request and the February 16, 2006 meeting minutes.[2] In addition, testimony of the Bank witnesses at times conflicted with other witnesses. For example, Allen Zirkelbach, the Bank’s chairman of the board of directors, testified that Mr. Putnam said Icard represented U.S. Funding, an entity with a lien on one of the parcels included in Phase I of the River Meadows project, at the February 16th meeting. In contrast, Mr. Putnam testified that he did not know until after the closing of the loan that Mr. Messick represented U.S. Funding. It was up to the jury to decide what weight to give to the testimony of these witnesses. See Reeves, 530 U.S. at 150, 120 S.Ct. at 2110. *862 On this record, I believe the District Court properly denied Icard’s Rule 50 motion and we should affirm the jury verdict on the legal malpractice claim.
The jury also heard sufficient evidence to reach the conclusion that Icard breached its fiduciary duty. The Credit Request listed Mr. Messick as counsel for the Bank. Mr. Messick and/or his firm had repre-sénted the borrower, River Meadows, its founder, Mark Brivik, and U.S. Funding. Potential conflicts of interest arose when Mr. Messick was asked to represent the Bank.
What happened, or did not happen, regarding Mr. Messick telling the Bank about a potential conflict is not clear from the record. During Mr. Putnam’s deposition, he testified that he waived any conflict arising from Icard’s earlier representation of River Meadows. But at trial he conceded that he did not have the Bank’s authority to waive a conflict of interest. During his direct examination, Mr. Putnam testified, when asked if Mr. Messick asked him to waive a conflict of interest: “No, sir, not that I recall.” His recollection was later refreshed with his deposition testimony to the contrary. Neither party disputes that there is no writing in the record reflecting that the Bank waived a conflict.
After the Bank requested Icard’s representation, Mr. Messick’s paralegal performed a conflict check. Mr. Messick said he never saw the results of the check, which legal ethics expert Lawrence J. Fox testified was “unacceptable.” The conflict check form stated that Mr. Messick was representing both the lender (the Bank) and the borrower (River Meadows). Mr. Messick testified that the form contained an error because he did not represent River. Meadows.[3] Mr. Messick testified that he believed there was a potential conflict, so he discussed it with Mr. Putnam on the phone, but never put anything in writing. Mr. Messick stated that he had no reason to question Mr. Putnam’s purported authority to waive the conflict on behalf of the Bank, and did not think the waiver needed to be in writing.
The trial testimony of the legal ethics expert on Icard’s breach of its fiduciary duty is instructive. Mr. Fox stated that this case presents “a directly adverse representation” because Mr. Messick was “representing the lender adverse to the borrower.” Mr. Fox continued: “It’s a conflict of interest. It’s a direct conflict of interest. It’s an adverse conflict of interest.” He testified that the conflict between River Meadows and the Bank was “not waivable.” Although Mr. Messick claimed he wasn’t personally representing U.S. Funding at the time of closing, Mr. Fox called that “irrelevant because the firm was.” And Mr. Fox said that Mr. Messick breached confidentiality by sending information to U.S. Funding.[4] Mr. Fox summarized his testimony with the following: “[TJhis is one of the worst cases I’ve ever seen of a lawyer representing far too many people whose interests were in conflict without getting any sense of informed consent in a very dangerous situation where the interests really collided and the results were a disaster.” Mr. Fox, who lectures at Yale Law School, teaches *863 this case as a paradigm of what a law firm should not do when faced with a potential conflict.
Mr. Fox’s testimony contradicts the majority’s statement that there is no “testimony establishing what exactly Icard Merrill should have told the Bank before going forward with the representation.” Panel Op. at 857. As Mr. Fox explained, it should have told the Bank — and River Meadows — that its conflict was not waivable. In addition, it should not have sent confidential material to U.S. Funding. And it should have documented its actions in writing.
Regarding Icard’s failure to document its supposed communications about its conflicts, Mr. Messick claimed that he informed Mr. Putnam about the issue by phone. Even if this did happen it was not enough, according to Mr. Fox, because the conflict was not waivable. But the jury had reason to doubt Mr. Messick ever communicated the conflict at all. A number of Mr. Messick’s billing records were admitted at trial, and they regularly reflect calls to clients. But his billing records do not indicate he made this call. Icard had a duty to fully disclose all material facts to the Bank, FDIC v. Martin, 801 F.Supp. 617, 620 (M.D.Fla.1992), and this Court is required to grant the Bank the benefit of all reasonable inferences, Nebula Glass, 454 F.3d at 1210. As a result, Icard’s Rule 50 motion on the breach of fiduciary duty claim should fail, and we should affirm the District Court.
For these reasons, I respectfully dissent.

. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

. The jury also saw a map of the five parcels, hand drawn by a partner at Icard around 2005, which labeled Parcel V as “Option Property.”

. The majority recognizes the flaw in Mr. Messick's claim that he did not represent River Meadows at the closing. See Panel Op. at 4 (“Icard Merrill represented both the Bank and River Meadows at the closing.” (emphasis added)).

. This testimony was echoed by banking expert Mr. Riley, who also testified that it was "outrageous” for Icard to send the loan commitment letter to U.S. Funding because it was a confidential document that should only have been shared between the borrower and lender.