[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

No. 13-14332

————————————

D.C. Docket No.  8:11-cv-02831-VMC-MAP

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for First Priority Bank, Bradenton, Florida,

Plaintiff - Appellee,

versus

ICARD, MERRILL, CULLIS, TIMM, FUREN & GINSBURG, P.A.,
a Florida professional association,
ROBERT E. MESSICK, Esquire,
Individually,

Defendants - Appellants.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

(October 2, 2014)

Before MARTIN, Circuit Judge, and RESTANI,[*] Judge, and HINKLE,[**] District
Judge.

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by
designation.

[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida,
sitting by designation.

RESTANI, Judge:

The Federal Deposit Insurance Corporation ("FDIC"), as receiver for First Priority Bank ("the Bank"), brought claims alleging legal malpractice and breach of fiduciary duty against Defendants Robert E. Messick and Icard, Merrill, Cullis, Timm, Furen & Ginsburg, PA. (collectively, "Icard Merrill") arising from Icard Merrill's representation of the Bank in closing a $5.3 million loan to River Meadows Development, LLC ("River Meadows"). The FDIC alleged that absent Icard Merrill's negligence and breach of fiduciary duty, the Bank would not have made the loan, which subsequently went into default and was sold for approximately $700,000. A jury returned a verdict in favor of the FDIC in the amount of $1,149,051.09. Icard Merrill appeals the district court's denial of their motion for judgment as a matter of law, arguing that there was insufficient proof that their acts or omissions proximately caused the Bank's damages. We agree that there was insufficient evidence of causation and reverse.

## BACKGROUND

Messick, a partner at Icard, Merrill, Cullis, Timm, Furen & Ginsburg, PA., was hired by the Bank to close a $5.3 million loan to River Meadows. The loan was to be used to fund predevelopment costs of a housing project and to pay off an existing mortgage on one of the parcels of land to be developed for the project. The project was to be completed in two stages. The first stage ("Phase I")

2

involved the development of three parcels of land totaling approximately 22 acres. The second stage involved the development of two additional parcels of land, one of which was a 25-acre waterfront property ("the waterfront parcel").

Icard Merrill had assisted River Meadows' managing member, Mark Brivik, in obtaining four of the five parcels intended to be used as part of the project. They were unable, however, to acquire the waterfront parcel. Although Brivik sought an option to purchase the waterfront parcel, he was able to secure only a right of first refusal.

Icard Merril had also represented U.S. Funding, which held the mortgage to be paid off. The last extension of this mortgage was due to expire shortly before the loan from the Bank to River Meadows was executed.

The Chief Lending Officer at the Bank, Steve Putnam, drafted a preliminary Credit Approval Report ("CAR") to present to the Bank's loan committee, which had the authority to approve or deny the loan. The CAR included as collateral the assignment of an option to purchase the waterfront parcel and priced the option as "TBD" (shorthand for "to be determined"). The summary and collateral analysis sections of the CAR, however, did not mention the assignment of an option. The CAR also included as collateral a mortgage on the Phase I parcels and assignment of all plans, permits, and contracts related to the Phase I parcels. The Phase I parcels were appraised at $8,339,000 collectively. The CAR additionally indicated

3

that the guarantors on the loan (the individual investors in River Meadows) had a combined liquidity of $7.3 million.  The preliminary CAR was sent to Icard Merrill and Icard Merrill drafted the loan commitment letter based on the CAR.

The loan was approved by the loan committee on February 16, 2006.  The unsigned minutes of the committee meeting did not indicate any waiver of the requirement that an option to purchase the waterfront property be included as collateral.

The Bank and River Meadows subsequently executed the loan commitment letter, but the letter failed to include as collateral an assignment of an option to purchase the waterfront parcel.  The resultant loan documents likewise did not require the assignment of an option.  The loan closed on March 22, 2006.  Icard Merrill represented both the Bank and River Meadows at the closing.

The loan went into default in August 2007.  The Bank attempted to foreclose and filed a collection action against the guarantors.  The guarantors asserted that Icard Merril's conflicts of interest relieved them from liability on the loan.  The difficulties in collecting hindered the Bank in its attempt to sell the loan package and "quite a bit" of the loan was written off by the Bank.  The Bank failed during the foreclosure action.  The FDIC was appointed as receiver of the Bank and ultimately sold the loan package for $693,720.

The FDIC filed suit in December 2011.  The complaint alleged legal malpractice and breach of fiduciary duty for failing to obtain as collateral the assignment of an option to purchase the waterfront parcel, failing to obtain a written waiver of the requirement that the option be included as collateral, and failing to disclose that the purported option contract was actually a right of first refusal.  The complaint also alleged breach of fiduciary duty for failing to advise the Bank of Icard Merrill's conflicts of interest.  A jury found in favor of the FDIC on both counts.  The district court subsequently denied Icard Merrill's renewed motion for judgment as a matter of law.  Icard Merrill appeals.

## <u>JURISDICTION AND STANDARD OF REVIEW</u>

The district court had jurisdiction pursuant to 12 U.S.C. § 1819(b)(2) and 28 U.S.C. § 1331.  We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.  We review a district court's ruling on a motion for judgment as a matter of law de novo.  <u>Hubbard v. BankAtlantic Bancorp, Inc.</u>, 688 F.3d 713, 723 (11th Cir. 2012).  "Under Rule 50, a court should render judgment as a matter of law when . . . there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149 (2000) (internal quotation marks omitted).  The court reviews "all the evidence, drawing all reasonable inferences in favor of the nonmoving party."  <u>Hubbard</u>, 688 F.3d at 724.

**DISCUSSION**

Icard Merrill contends that there was insufficient evidence to support the jury's causation finding. To prove causation under Florida law,

> a plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

Guinn v. AstraZeneca Pharms. LP, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)); see also USA Interactive v. Dow Lohnes & Albertson, P.L.L.C., 328 F. Supp. 2d 1294, 1308, 1313 & n.42 (M.D. Fla. 2004) (applying this standard to both legal malpractice and breach of fiduciary duty claims). Icard Merrill argues that the FDIC failed to present sufficient evidence for a reasonable jury to find that Icard Merrill's negligence or breach of fiduciary duty caused the Bank to enter into a loan that the Bank otherwise would not have made. We agree.

I.    Negligence Claim

The evidence relied upon by the FDIC to support its negligence claim generally shows that the Bank approved the loan with the understanding that the assignment of an option to purchase the waterfront parcel would be included as collateral. Specifically, the FDIC makes much of the fact that Icard Merrill failed

6

to follow the CAR's instruction that an option to purchase the waterfront property be included as collateral. But this does not address the ultimate issue of whether the Bank would have approved the loan if it had known that River Meadows had only a limited right of first refusal.

The best evidence in support of the FDIC's negligence claim is that option contracts have some value as collateral and that the waterfront parcel was a unique piece of land that was important to the development project contemplated by River Meadows. But there is no way to gauge the importance of the purported option contract to the Bank, because no evidence was presented as to any of the terms of the purported option. Although evidence presented at trial suggested that the waterfront property might have been worth between $6 million and $8.3 million, there was no evidence indicating the price to be paid to exercise the purported option, or even how long River Meadows had to exercise that option. An option to pay $7 million for property worth $6 million, for example, would be of less value and importance to the Bank than an option to purchase the same property for $5 million. Without knowing the terms of the purported option or hearing evidence that the option at some price on this parcel was crucial to the Bank's decision, the jury was required to speculate as to how the Bank would have responded upon learning that River Meadows had only a limited right of first refusal.

Nor can any inference favoring the FDIC be drawn regarding the importance

7

of the option contract based on the other collateral for the loan.  The loan appeared to be adequately secured, regardless of whether there was an option to purchase the waterfront property or only a limited right of first refusal.  Even without the assignment of the option contract, the $5.3 million loan was secured by mortgages on the Phase I parcels, which were valued at over $8.3 million, and the guarantors combined had $7.3 million in liquid assets.  The FDIC's banking expert even testified that he was "not here to quibble" with the Bank's decision to approve the loan if it received as collateral only the assignment of a right of first refusal on the waterfront property.  And the FDIC failed to present a single Bank employee to testify that the loan would not have been made had the Bank known that River Meadows had only a limited right of first refusal.  Thus, any inference that the option contract was a key part of the loan based on the inadequacy of the other security for the loan would be unsupported by the record.

In sum, nothing in the record suggests that an option to purchase the waterfront property was so important to the Bank that it more likely than not would have declined River Meadows' loan request once the Bank learned that the option to purchase was actually a limited right of first refusal.  That the Bank might have acted differently is insufficient.  The district court's denial of Icard Merrill's motion for judgment as a matter of law on the negligence claim therefore is reversed.

8

II.    Breach of Fiduciary Duty Claim

Regarding the breach of fiduciary duty claim, the FDIC argues that "a reasonable jury could infer that Messick and the Icard's [sic] failure to notify the Bank of the lack of an option contract or their extensive conflicts of interest, with all their ramifications, proximately caused the Bank's loss." As explained above, any finding that the Bank would have acted differently had it known that River Meadows had a limited right of first refusal instead of an option contract was based on speculation. As explained below, the evidence regarding Icard Merrill's failure to counsel the Bank regarding Icard Merrill's conflicts of interest also is insufficient to support a finding that Icard Merrill's breach of fiduciary duty caused the Bank to enter into a loan it otherwise would not have made.

The FDIC elicited testimony from the Bank's former Chairman of the Board, Alan Zirkelbach, and the Bank's former President, George Najmy, that the guarantors were an important consideration in making the loan and that when the Bank tried to collect from the guarantors following default, the guarantors resisted paying on the basis of Icard Merrill's conflicts of interest. Lawrence Fox, the FDIC's legal expert, also explained that an attorney has a duty to explain to his client the potential risks of proceeding with a lawyer operating under a conflict of interest. Absent, however, are any details about the specific defense(s) asserted by the guarantors, any testimony establishing what exactly Icard Merrill should have

9

told the Bank before going forward with the representation, and any evidence suggesting what the Bank would have done once it had been counseled properly.

The jury was asked to assume that Icard Merrill should have warned the Bank that Icard Merrill's conflicts of interest might present a bar to collecting from the guarantors and that the Bank would have walked away from the loan. But there is not enough evidence in the record to make this conclusion without engaging in speculation. There is no evidence showing that this particular issue should have been foreseen by Icard Merrill (which is not surprising given that there was no evidence regarding the specifics of the defense), that the risk to the Bank of the guarantors potentially raising such a claim was high at the time the Bank made the loan, or that the defense raised by the guarantors was likely to be successful. Nor is there any testimony that the Bank would have decided not to make the loan had it been properly counseled. The $5.3 million loan was still secured by mortgages on property valued at approximately $8.3 million, which resulted in a loan to value ratio of 63.5 percent. The Bank's policies allowed it to make loans with a loan to value ratio of 65 percent or less, and thus this loan still would have been permitted under the Bank's policies.

On these facts, any finding that Icard Merrill's breach of fiduciary duty caused the Bank to enter into a loan it otherwise would not have made was based on speculation. Therefore, we reverse the district court's denial of Icard Merrill's

10

motion for judgment as a matter of law on the breach of fiduciary duty claim as well.

## CONCLUSION

"A mere possibility" that the defendant's acts or omissions caused the plaintiff's harm "is not enough." Guinn, 602 F.3d at 1256. Because the evidence presented at trial established nothing more than a possibility that the Bank would have rejected River Meadows' loan request, the district court's denial of Icard Merrill's renewed motion for judgment as a matter of law is

**REVERSED.**

HINKLE, District Judge, concurring:

I join the majority opinion in full and add these comments in response to the dissent.

The bank chose to make this real-estate loan. The loan had a modest loan-to-value ratio and was guaranteed by individuals with liquid assets exceeding the amount of the loan. For a bank with liberal lending practices—the FDIC itself has complained of this—this must have been an easy loan to approve. Ultimately, the loan went into default, as did many real-estate loans made at that time.

The bank was represented by an attorney with an egregious conflict of interest. But a strong case on liability does not mean there was a strong case—or any case at all—on damages. The FDIC is entitled to recover from the attorney only any damages caused by the attorney's actions. And the FDIC's only damages theory was that in the absence of the option, the bank would not have made the loan at all.

Not a shred of evidence supports that theory.

The bank was full of officers and loan-committee members who worked on and approved this loan. Several testified that the bank knew there was no option and made the loan anyway. Not a one testified that the bank would not have made the loan in the absence of the option. Not a one.

12

The bank undoubtedly made and turned down many loans during its existence.  The FDIC had all the records.  The FDIC was unable to introduce evidence of any proposed loan comparable to this one that the bank turned down, ever.  Not a one.

The FDIC has enormous resources and brought them to bear on this case, presenting the testimony of two very well qualified experts.  But neither addressed the critical issue: whether, in the absence of the option, the bank would have made this loan.  The country is full of banking experts, including one who testified for the FDIC in this case.  But the FDIC was unable to find a single expert anywhere in the country who would support its damages theory.  Not a one.

Jury verdicts are entitled to enormous deference.  But motions for judgment as a matter of law exist for a reason.  They exist for cases just like this one.

MARTIN, Circuit Judge, dissenting:

In reviewing a District Court's denial of a motion pursuant to Rule 50 of the Federal Rules of Civil Procedure, we must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for the plaintiff." Nebula Glass Intern., Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006) (alteration and quotation marks omitted). "Judgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001). This standard does not allow us to scrutinize the testimony and evidence actually presented at this trial, with an eye towards what we ourselves would have required in order to render the verdict which this jury did. Neither does it allow us to speculate about how the FDIC could have or should have tried this case in order to persuade us to their side. Instead our charge is to draw "all inferences in favor of the non-moving party," and affirm the verdict where there is any legal basis upon which the jury could have found for the FDIC. Telecom Technical Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004). With these rules in mind, and having reviewed the evidence which I summarize below, I would not overturn the verdict reached by the jury here. I therefore respectfully dissent.

Steve Putnam, executive vice president and chief lending officer at the now-

14

defunct First Priority Bank (the Bank), drafted the credit approval request (Credit Request) at the heart of this case. The Credit Request Mr. Putnam drafted and circulated to key Bank employees described the loan's collateral as including "assignment of the option contract to purchase" Parcel V, a 25-acre waterfront parcel critical to Phase II of the planned two-phase project. The Credit Request also included language saying that River Meadows Development, LLC (River Meadows) "has purchased or contracted to purchase" a "25-acre Land Parcel (Option Contract)" for a price to be determined. Neither of these statements was true. Beyond that, the Credit Request stated that Phase II "will consist" of Parcel V. But the purchase of the 25-acre land parcel never happened, because the project collapsed before there ever was a Phase II.

Mr. Putnam and the Bank hired Robert E. Messick and his firm, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. (collectively Icard), to represent the Bank in closing the loan. A few days before the scheduled closing on February 16, 2006, Mr. Putnam sent the Credit Request to Mr. Messick, a man Mr. Putnam had known for about 20 years. Mr. Messick knew there was no option contract on Parcel V because he had represented River Meadows in ultimately unsuccessful negotiations with the owners of the parcel to obtain it. Mr. Messick testified at trial that he did not know if he noticed the Credit Request inaccurately stated River Meadows, the borrower, had "purchased or contracted to purchase" Parcel V. But

15

Mr. Messick did notice "an error" in a "summary of the collateral description."

Icard had a reasonable duty to inform Mr. Putnam about all of the errors in the Credit Request, given that approval of the loan was based on representations in that document. See Proto v. Graham, 788 So. 2d 393, 395 (Fla. 5th DCA 2001). The jury received conflicting evidence about whether Mr. Messick told Mr. Putnam about all of the errors in the Credit Request. Mr. Messick testified that he told Mr. Putnam about "an error" in the "summary of the collateral description" in advance of the February 16 meeting. But Mr. Messick's billing records, admitted as evidence, reflect no entry for any such conversation. Though the absence of an entry is not dispositive, a juror could find it persuasive because Mr. Messick's billing records regularly noted client communications. Mr. Putnam testified at trial that he "would have to say that" Mr. Messick told him about a problem with the Credit Request's collateral description before the meeting. But the jury could have given little weight to Mr. Putnam's trial testimony both because his testimony was equivocal about what actually happened and also because he admitted that his trial testimony on this point "sound[ed] contradictory to what [he] said in [his] deposition." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000) (quotation marks omitted). Given the record, a reasonable juror

16

had enough evidence to infer that Mr. Messick failed to notify Mr. Putnam about errors in the Credit Request before the loan committee meeting.

Evidence at trial suggested that Mr. Putnam did not give fully accurate information to the senior loan committee at the February 16, 2006 meeting. In advance of that meeting Mr. Putnam made no effort to correct the fact that the Credit Request incorrectly listed the option contract on Parcel V as part of the collateral for the loan. He testified that if he had learned that River Meadows did not have an option contract before the meeting, he would have waited to explain that fact to the loan committee at the meeting. The jury saw the minutes from the February 16, 2006 meeting. Mr. Putnam testified that those minutes would "absolutely" be different than the Credit Request because they would indicate that he "present[ed] the new facts" in an "oral presentation." In fact, the meeting minutes are in no way different from the Credit Request, and give no indication that Mr. Putnam presented any new facts. Rather, the minutes indicate that the loan was conditioned, in part, on the assignment of an option contract for Parcel V. According to the minutes, the loan was approved "as presented," which included Parcel V as collateral. The loan committee did not amend the Credit Request in any way.

Icard was supposed to draft the loan commitment letter in keeping with the Credit Request, but it did not. The Bank's written instructions to Icard for drafting

17

the loan commitment letter came exclusively from the Credit Request. No individual loan committee member could change the terms of a Credit Request; that could only be done by the committee itself. Yet Mr. Messick testified at trial that he did not view the Credit Request "as absolute instructions from the bank." It is thus no surprise that according to the trial testimony of Mark Riley, an expert on banking, Mr. Messick "did not follow the terms of the [Credit Request]."

It was reasonable for this jury to look at the evidence presented and conclude that the Bank would not have made the loan without the acts and omissions of Icard. The Credit Request indicated in several places that collateral for the loan included an option contract for Parcel V. Mr. Messick knew this was false, but it is not clear that he took action when he could have to correct the problems. The minutes from the February 16, 2006 meeting indicate that the loan committee believed that Parcel V was part of the collateral, and made its decision based on that fact. The loan committee never changed the description of the loan's collateral to show that the collateral did not include the option on Parcel V, as the rules of the Bank required. And although Icard's written instructions in preparing the loan commitment letter came only from the Credit Request, the letter it prepared failed to mention Parcel V.

The majority has held that "any inference that the option contract was a key part of the loan based on the inadequacy of the other security for the loan would be

18

unsupported by the record." Panel Op. at 8. But based on the evidence I have just reviewed, I believe the record does support an inference that the option contract was important to the Bank's approval of the loan. Also, as the Majority recognizes, Parcel V "was a unique piece of land that was important to the development project contemplated by River Meadows." Panel Op. at 7. Even if the jury had to "speculate" about the Bank's response and rely on circumstantial evidence that the Bank would not have made the loan without the option, Panel Op. at 8, this type of evidence can support a finding of causation. See Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1565 (11th Cir. 1995); see also Fenner v. Gen. Motors Corp., 657 F.2d 647, 650 (5th Cir. 1981)[1] ("This Court recognizes that a jury may properly reconstruct a series of events by drawing an inference upon an inference."). Here the jury and the District Court both found sufficient evidence to support a verdict in favor of the FDIC. On this record, I would not disturb their judgment. See Reeves, 530 U.S. at 149, 120 S. Ct. at 2109 (noting that a Rule 50 motion should be granted only when "there is no legally sufficient evidentiary basis" to support the verdict (quoting Fed. R. Civ. P. 50(a)).

Although the jury heard from some loan committee members that they would have made the loan regardless of whether Parcel V was included as

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

19

collateral, the jury had more than one reason to give minimal weight to that testimony.  As the District Court noted, the jury could have had reason to find that those members were unreliable because "it is reasonable for a jury to assign a higher value and level of credibility to a written document than to contradictory and often obfuscated oral testimony.  After all, the purpose of writing information down is to compensate for the tendency of memories to fade or change."  At least two written documents were in tension with the Bank witnesses' testimony: the Credit Request and the February 16, 2006 meeting minutes.2  In addition, testimony of the Bank witnesses at times conflicted with other witnesses.  For example, Allen Zirkelbach, the Bank's chairman of the board of directors, testified that Mr. Putnam said Icard represented U.S. Funding, an entity with a lien on one of the parcels included in Phase I of the River Meadows project, at the February 16th meeting.  In contrast, Mr. Putnam testified that he did not know until after the closing of the loan that Mr. Messick represented U.S. Funding.  It was up to the jury to decide what weight to give to the testimony of these witnesses.  See Reeves, 530 U.S. at 150, 120 S. Ct. at 2110.  On this record, I believe the District Court properly denied Icard's Rule 50 motion and we should affirm the jury verdict on the legal malpractice claim.

The jury also heard sufficient evidence to reach the conclusion that Icard

---

2 The jury also saw a map of the five parcels, hand drawn by a partner at Icard around 2005, which labeled Parcel V as "Option Property."

breached its fiduciary duty. The Credit Request listed Mr. Messick as counsel for the Bank. Mr. Messick and/or his firm had represented the borrower, River Meadows, its founder, Mark Brivik, and U.S. Funding. Potential conflicts of interest arose when Mr. Messick was asked to represent the Bank.

What happened, or did not happen, regarding Mr. Messick telling the Bank about a potential conflict is not clear from the record. During Mr. Putnam's deposition, he testified that he waived any conflict arising from Icard's earlier representation of River Meadows. But at trial he conceded that he did not have the Bank's authority to waive a conflict of interest. During his direct examination, Mr. Putnam testified, when asked if Mr. Messick asked him to waive a conflict of interest: "No, sir, not that I recall." His recollection was later refreshed with his deposition testimony to the contrary. Neither party disputes that there is no writing in the record reflecting that the Bank waived a conflict.

After the Bank requested Icard's representation, Mr. Messick's paralegal performed a conflict check. Mr. Messick said he never saw the results of the check, which legal ethics expert Lawrence J. Fox testified was "unacceptable." The conflict check form stated that Mr. Messick was representing both the lender (the Bank) and the borrower (River Meadows). Mr. Messick testified that the form contained an error because he did not represent River Meadows.3 Mr. Messick

---

3 The majority recognizes the flaw in Mr. Messick's claim that he did not represent River

testified that he believed there was a potential conflict, so he discussed it with Mr. Putnam on the phone, but never put anything in writing.  Mr. Messick stated that he had no reason to question Mr. Putnam's purported authority to waive the conflict on behalf of the Bank, and did not think the waiver needed to be in writing.

The trial testimony of the legal ethics expert on Icard's breach of its fiduciary duty is instructive.  Mr. Fox stated that this case presents "a directly adverse representation" because Mr. Messick was "representing the lender adverse to the borrower."  Mr. Fox continued: "It's a conflict of interest.  It's a direct conflict of interest.  It's an adverse conflict of interest."  He testified that the conflict between River Meadows and the Bank was "not waivable."  Although Mr. Messick claimed he wasn't personally representing U.S. Funding at the time of closing, Mr. Fox called that "irrelevant because the firm was."  And Mr. Fox said that Mr. Messick breached confidentiality by sending information to U.S. Funding.[4]  Mr. Fox summarized his testimony with the following: "[T]his is one of the worst cases I've ever seen of a lawyer representing far too many people whose interests were in conflict without getting any sense of informed consent in a very

---

Meadows at the closing.  See Panel Op. at 4 ("Icard Merrill represented both the Bank and River Meadows at the closing." (emphasis added)).

[4] This testimony was echoed by banking expert Mr. Riley, who also testified that it was "outrageous" for Icard to send the loan commitment letter to U.S. Funding because it was a confidential document that should only have been shared between the borrower and lender.

22

dangerous situation where the interests really collided and the results were a disaster." Mr. Fox, who lectures at Yale Law School, teaches this case as a paradigm of what a law firm should not do when faced with a potential conflict.

Mr. Fox's testimony contradicts the majority's statement that there is no "testimony establishing what exactly Icard Merrill should have told the Bank before going forward with the representation." Panel Op. at 10. As Mr. Fox explained, it should have told the Bank—and River Meadows—that its conflict was not waivable. In addition, it should not have sent confidential material to U.S. Funding. And it should have documented its actions in writing.

Regarding Icard's failure to document its supposed communications about its conflicts, Mr. Messick claimed that he informed Mr. Putnam about the issue by phone. Even if this did happen it was not enough, according to Mr. Fox, because the conflict was not waivable. But the jury had reason to doubt Mr. Messick ever communicated the conflict at all. A number of Mr. Messick's billing records were admitted at trial, and they regularly reflect calls to clients. But his billing records do not indicate he made this call. Icard had a duty to fully disclose all material facts to the Bank, FDIC v. Martin, 801 F. Supp. 617, 620 (M.D. Fla. 1992), and this Court is required to grant the Bank the benefit of all reasonable inferences, Nebula Glass, 454 F.3d at 1210. As a result, Icard's Rule 50 motion on the breach of fiduciary duty claim should fail, and we should affirm the District Court.

23

For these reasons, I respectfully dissent.